Michael SCHIAVONE, Plaintiff,

v.

Herbert H. PEARCE; Donald B. Lippincott; Kerr McGee Corporation; Penn Central Corporation, Defendants.

KERR–McGEE CHEMICAL CORPORATION, Defendant–Third–Party Plaintiff–Appellant,

v.

UNION CAMP CORPORATION, Third–Party Defendant–Appellee.

No. 944, Docket 95–7627.

United States Court of Appeals, Second Circuit.

Argued Jan. 19, 1996.

Decided March 14, 1996.

Gregory A. Sharp, Hartford, Connecticut (Michael J. Donnelly, Murtha, Cullina, Richter and Pinney, Hartford, Connecticut, of counsel), for Defendant–Third–Party Plaintiff–Appellant.

Elizabeth C. Barton, Hartford, Connecticut (Harold M. Blinderman, Jennifer A. Osowiecki, Updike, Kelly & Spellacy, P.C., Hartford, Connecticut, of counsel), for Third–Party Defendant–Appellee.

Before: NEWMAN, Chief Judge, MAHONEY, Circuit Judge, and SAND, District Judge.*

SAND, District Judge:

Defendant-third-party plaintiff-appellant Kerr–McGee Chemical Corporation ("Kerr–

McGee")[1] appeals from an order entered June 1, 1995, pursuant to an opinion dated August 25, 1994, in the United States District Court for the District of Connecticut, Peter C. Dorsey, *Chief Judge,* granting third-party-defendant-appellee Union Camp Corporation's ("Union Camp")[2] motion for summary judgment. We conclude that the indemnification agreement relied on by Union Camp does not transfer the direct liabilities of Union Camp to Kerr–McGee. Thus, Kerr–McGee may be entitled to contribution from Union Camp under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), as amended, 42 U.S.C. § 9601 *et seq.,* and under Conn.Gen. Stat. § 22a–452. We vacate and remand for findings as to Union Camp's CERCLA and state statutory liability.

## Background

Union Bag & Paper, the predecessor of Union Camp, formed American Creosoting Corporation ("AmCre Corp.") in 1956 to facilitate Union Camp's acquisition of certain assets from American Creosoting Company. With funds supplied by Union Camp, AmCre Corp., a wholly owned subsidiary of Union Camp, purchased these assets, which included a business on certain leased real property in North Haven, Connecticut. American Creosoting Company had operated a creosoting facility on this property since 1922. On July 24, 1964, Union Camp entered into a stock purchase agreement with Kerr–McGee Oil, the predecessor of Kerr–McGee Corporation, whereby Kerr–McGee acquired AmCre Corp. In Section 4 of this stock purchase agreement ("the indemnification agreement"), which the parties accepted in New York and contemplated closing in New York, Union Camp agreed to indemnify and hold harmless AmCre Corp. and Kerr–McGee for legal claims and suits filed against them prior to August 1, 1965. The indemnification agreement reads, in pertinent part:

Union [Camp] hereby indemnifies and agrees to hold [AmCre Corp.] harmless from and against any and all of the following: ...

(iii) Any obligation or liability of [AmCre Corp.] under or pursuant to any legal action or other proceeding, now or hereafter instituted, based on a cause of action arising out of or attributable to the operations or activities of [AmCre Corp.] prior to the time of Closing hereunder; and Union does further indemnify and agree to hold Kerr–McGee harmless from any and all loss or expense, of whatsoever nature, which Kerr–McGee may sustain or incur by reason of any such liability or obligation....

J.A. at 86. Subsequent to its purchase of AmCre Corp., Kerr–McGee changed the name of AmCre Corp. to Moss American, Inc. ("Moss American"). In 1974 Kerr–McGee Chemical Corporation, a subsidiary of Kerr–McGee Corporation, merged with Moss American, assuming all Moss American's liabilities.

A contract between AmCre Corp. and the New York, New Haven and Hartford Railroad Company ("the Railroad"), concerning the operations of the creosoting plant in North Haven, Connecticut ("the plant"), forms the basis of the underlying action. From approximately 1921 through 1966, the Railroad owned the property on which the plant is located and leased it to American Creosoting Company. The property, which changed ownership several times over subsequent years, suffered creosote contamination as a result of the plant's storage, handling, and disposal activities. Prior to September 25, 1984, at the behest of the Connecticut Department of Environmental Protection, the then-owners of the property, defendants Herbert H. Pearce ("Pearce") and Donald B. Lippincott ("Lippincott"), implemented a remedial program to cleanse the land. Their curative efforts, however, were not without critics.

---

**1.** For purposes of this opinion, we use the short form "Kerr–McGee" to include (1) defendant-third-party plaintiff-appellant Kerr–McGee Chemical Corporation; (2) its parent, defendant Kerr–McGee Corporation; and (3) Kerr–McGee Oil, the predecessor of Kerr–McGee Corporation.

**2.** For purposes of this opinion, the term "Union Camp" refers collectively to Union Camp Corporation and Union Bag & Paper, the predecessor of Union Camp Corporation.

Plaintiff Michael Schiavone, who purchased the property from Pearce and Lippincott by warranty deed on or about October 23, 1984, commenced the underlying lawsuit, alleging that Pearce and Lippincott had inadequately remediated the creosote contamination, causing plaintiff to incur substantial clean-up costs. Plaintiff named Kerr–McGee as a defendant.[3] Kerr–McGee impleaded Union Camp, seeking contribution based on Union Camp's management of the plant, through the activities of Union Camp's wholly-owned subsidiary and the title owner of the plant, AmCre Corp., from 1956 through 1964.

During that period, Union Camp and AmCre Corp. shared the same board of directors, and several of AmCre Corp.'s high-ranking officers, specifically its president, general counsel, assistant comptroller, and assistant treasurer, were also employed by Union Camp. During the years in question, Union Camp's legal department rendered services to AmCre Corp., including the review and approval of the 1958 renewal of the contract concerning the operations of the plant. Kerr–McGee states that several Union Camp employees participated, as officers and directors of AmCre Corp., in the negotiations surrounding the 1958 contract renewal. Kerr–McGee also maintains that during this period, the interlocking Union Camp–AmCre Corp. board of directors examined and approved capital expenditures, including pollution-control equipment, for AmCre Corp.'s creosoting plants.[4] It is Kerr–McGee's contention that Union Camp's sustained involvement in the plant's operations reflects an exercise of control by Union Camp sufficient to render Union Camp directly liable for the environmental harm caused.

Union Camp moved for summary judgment on both the CERCLA and state statutory claims. On August 25, 1994, the district court granted the motion, finding that the indemnification agreement shifted all Union Camp's liabilities, including environmental liabilities, to Kerr–McGee. The district court did not address the factual question of the extent of Union Camp's direct liability, if any, as it deemed Kerr–McGee's CERCLA and state statutory claims to be barred, based on the indemnification agreement. On September 14, 1994, Kerr–McGee moved for reconsideration, arguing that the district court had incorrectly interpreted the indemnification agreement and had improperly declined to address the issue of Union Camp's direct CERCLA and state statutory liability. In an April 18, 1995, ruling, the district court denied Kerr–McGee's motion, and on June 1, 1995, final judgment was entered in favor of Union Camp.

This appeal followed.

### Discussion

We review a grant of summary judgment *de novo*. *Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir.1994). The question answered by the district court, and thus before this court on appeal, involves the interpretation of contractual language. The precise issue is whether the indemnification agreement transfers Union Camp's direct liabilities to Kerr–McGee.

Kerr–McGee's theory of liability is that, given the degree to which Union Camp controlled the management of the plant, Union Camp has incurred direct and independent liability as an operator under CERCLA, 42 U.S.C. §§ 9607(a)(2). Kerr–McGee's contribution claim is based also on Conn.Gen.Stat. § 22a–452, which provides a private right of action for reimbursement of environmental clean-up costs. In essence, Kerr–McGee asserts that Union Camp's own actions in advising and overseeing the plant's operations subject it directly, not derivatively through AmCre Corp., to CERCLA and state statutory liability.

---

3. Specifically, both Kerr–McGee Corporation and Kerr–McGee Chemical Corporation are named defendants, the former as a result of its acquisition of AmCre Corp. through the 1964 stock purchase, and the latter in light of the 1974 merger whereby Kerr–McGee Chemical Corporation assumed all liabilities of the former AmCre Corp.

4. Union Camp disagrees with Kerr–McGee over the extent of participation by its employees in negotiating the 1958 contract renewal and in approving AmCre Corp.'s capital expenditures.

This appeal, although involving an indemnification agreement, does not turn on contractual indemnification claims. Kerr–McGee's third-party action against Union Camp does not derive from the indemnification language, but rather from Union Camp's alleged CERCLA and state statutory liability, separate and distinct from the indemnification agreement. The agreement has relevance only for Union Camp's defense: Union Camp contends that under the indemnification agreement, all Union Camp's liabilities relating to the plant were transferred to Kerr–McGee after the August 1, 1965, cut-off date.

▮ Summary judgment is appropriate only when the language of a contract is "wholly unambiguous." *Mellon,* 31 F.3d at 115; *Sayers v. Rochester Telephone Corp.,* 7 F.3d 1091, 1094 (2nd Cir. 1993). The question of whether contract language is plain or ambiguous is to be determined by the court as a matter of law. *Sayers,* 7 F.3d at 1094. The trial court found the language of the indemnification agreement unambiguously to shift Union Camp's liabilities to Kerr–McGee and thus awarded summary judgment to appellee. Although we also find the language in question to be unambiguous, we disagree with the lower court's interpretation of that language. We read the indemnification agreement as embracing the liabilities only of *AmCre Corp.,* not of *Union Camp.*

### A. The Indemnification Agreement

▮ A purchase agreement entered into in New York, with closing contemplated in New York, is to be interpreted under New York law. *See Tehran–Berkeley Civil and Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989); *Risser v. Hirshhorn,* 199 F.2d 917, 919 (2d Cir.1952); *Resnick v. Sikorsky Aircraft,* 660 F.Supp. 415, 417 n. 3 (D.Conn.1987). New York law mandates strict judicial scrutiny of indemnification agreements. *Commander Oil Corp. v. Advance Food Serv. Equip.,* 991 F.2d 49, 51 (2d Cir.1993) (citing *Heimbach v. Metropolitan Transp. Auth.,* 75 N.Y.2d 387, 553 N.Y.S.2d 653, 657, 553 N.E.2d 242, 246 (1990)); *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 15 (2d Cir.1993). We

thus proceed to a careful examination of the language of Section 4 of the indemnification agreement.

Union Camp's indemnification covers "any obligation or liability of [AmCre Corp.] ... under or pursuant to any legal action ..., based on a cause of action arising out of or attributable to the operations or activities of [AmCre Corp.]," as well as "any and all loss or expense ... which Kerr–McGee may sustain or incur by reason of any such liability or obligation...." J.A. at 86. Kerr–McGee focuses on the explicit language, "any obligation or liability *of [AmCre Corp.],*" in arguing that the liability section of the indemnification agreement concerns only AmCre Corp.'s liabilities, not those of Union Camp. In a closely related argument, Kerr–McGee also maintains that the parties never intended Section 4, an indemnification provision, actually to *transfer* liability. Union Camp looks to the wording, "arising out of or attributable to the operations or activities of [AmCre Corp.]," for its contention that the indemnification agreement allocates, after the cut-off date, all liabilities *related to* AmCre Corp., regardless of who incurred the liabilities. The district court, relying on the same phrase, similarly read the indemnification agreement as transferring all AmCre Corp.-related liabilities to Kerr–McGee.

A close reading of that language supports the interpretation proffered by Kerr–McGee. The phrase on which the district court so heavily relied as embracing liabilities incurred by Union Camp—"arising out of or attributable to the operations or activities of [AmCre Corp.]"—seems better understood simply as modifying "cause of action." It thus limits Union Camp's blanket indemnification of AmCre Corp. and Kerr–McGee to suits concerning AmCre Corp.'s business operations. This adjectival clause in no way alters the core of the indemnification agreement, indemnifying AmCre Corp. and Kerr–McGee for "any obligation or liability *of [AmCre Corp.]* " prior to August 1965.

▮ Under this close reading, which *Commander Oil* and *Olin* compel that we give indemnity agreements, the expiration of the indemnification period shifted to Kerr–McGee full responsibility only for AmCre

Corp.'s liabilities. Nowhere in the indemnification agreement are liabilities of Union Camp mentioned, let alone transferred, to Kerr–McGee. Nonetheless, as will appear, the intent of the parties as manifested in the indemnity agreement contributes to our conclusion that Union Camp may be held liable to Kerr–McGee only insofar as that liability derives from Union Camp's own culpable conduct, as distinguished from its former status as the owner of AmCre Corp.

## B. CERCLA Liability

### 1. Operator Liability

CERCLA charges with liability four categories of persons, one of which is "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such . . . ." disposal took place. 42 U.S.C. § 9607(a)(2). " 'Owner or operator' means . . . any person owning or operating such facility . . .," *id.* § 9601(20)(A)(ii), and "person" is defined as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body," *id.* § 9601(21).

In light of the indemnification agreement, a perceived tension exists between any liabilities Union Camp may have independently, as an operator under CERCLA, and any liabilities that Union Camp may possess derivatively, as the parent of AmCre Corp. This seeming conflict turns on the characterization of Union Camp's liability: whether, although "arising out of or attributable to the operations or activities of [AmCre Corp.]," it nevertheless results from Union Camp's *own* actions related to management of the plant, or whether it instead results from AmCre Corp.'s actions only, with Union Camp's liability arising from traditional concepts of corporate veil piercing. *See* Lynda J. Oswald & Cindy A. Schipani, CERCLA and the "Erosion" of Traditional Corporate Law Doctrine, 86 Nw.U.L.Rev. 259, 301 (1992) ("In considering the liability of parent corporations for the environmental torts of their subsidiaries, the issue is often whether the applicable standard of liability derives from common

law principles of corporate law or from direct application of the statutory definitions of CERCLA."). The classification of Union Camp's liability is of great relevance, for if its liability is derivative, attaching to Union Camp only as a result of the acts of its subsidiary, then the liability effectively is that of AmCre Corp. and would fall within the terms of the indemnification agreement.

■ This perceived tension between direct liability and liability based on veil piercing can be reconciled, however, when examined against the overall goals of CERCLA and the uniqueness of its statutory scheme. Congress enacted CERCLA with the expansive, remedial purpose of ensuring "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980), *reprinted in* 1980 U.S.C.A.A.N. 6119, 6119, *and in* 1 CERCLA, Legislative History, at 320 (1980). One of CERCLA's primary goals is to extend liability to all those involved in creating harmful environmental conditions. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992); *General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 285 (2d Cir.1992); *United States v. A & N Cleaners and Launderers, Inc.*, 788 F.Supp. 1317, 1322 (S.D.N.Y.1992); *City of New York v. Exxon Corp.*, 744 F.Supp. 474, 485 (S.D.N.Y.1990), *adhered to on reconsideration*, 766 F.Supp. 177 (S.D.N.Y.1991). Courts should construe the statute liberally in order to effect these congressional concerns. *B.F. Goodrich*, 958 F.2d at 1198; *General Elec.*, 962 F.2d at 285. An interpretation of CERCLA that imposes operator liability directly on parent corporations whose own acts violate the statute is consistent with the general thrust and purpose of the legislation.

Courts have held parent corporations independently liable, as operators, for the activities of their subsidiaries. *See, e.g., United States v. TIC Inv. Corp.*, 68 F.3d 1082, 1091 (8th Cir.1995); *Jacksonville Elec. Auth. v. Bernuth Corp.*, 996 F.2d 1107, 1110 (11th Cir.1993); *City of New York v. Exxon Corp.*, 112 B.R. 540, 547–48 (S.D.N.Y.1990). Recognizing that the resulting liability may not be consistent with traditional rules of corporate

liability, *United States v. USX Corp.*, 68 F.3d 811, 822 (3d Cir.1995), courts have found such direct liability nonetheless to be compatible with CERCLA's expansive goals. *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833, 843 (3d Cir.1994); *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1221 (3d Cir.1993); *United States v. Kayser–Roth Corp.*, 910 F.2d 24, 26 (1st Cir.1990), *cert. denied*, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991); *cf. A & N Cleaners*, 788 F.Supp. at 1331 (noting, in landlord-tenant context, that "courts generally resolve ambiguities in CERCLA's language in favor of imposing the most expansive liability, citing the statute's remedial purpose"). Indeed, a parent and its subsidiary have both been held independently accountable, as operator and owner respectively, for environmental harms stemming from the same activities. *See FMC Corp.*, 29 F.3d at 843; *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 408 (1st Cir.1993). Such a departure from common law principles of corporate insulation can be explained by the uniqueness of CERCLA's legislative scheme, specifically by the recognition that "CERCLA liability is often broader than these traditional purposes would justify." Richard B. Stewart & Bradley M. Campbell, Lessons From Parent Liability Under CERCLA, 6 Nat.Resources & Env't 7, 9 (Winter 1992).

Courts imposing operator liability directly on a parent corporation have drawn support not only from legislative intent, but also from related statutory language. The most compelling argument points to the distinction between "owner" and "operator," as evidenced by Congress' inclusion of both terms. Observing that " 'owner' liability and 'operator' liability denote two separate concepts," courts stress the disjunctive character of CERCLA liability. *Lansford–Coaldale*, 4 F.3d at 1220; *see USX Corp.*, 68 F.3d at 822–

23; *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 421 (7th Cir.1994); *Kayser–Roth*, 910 F.2d at 27; *New York v. Solvent Chem. Co.*, 875 F.Supp. 1015, 1019 (W.D.N.Y.1995); *A & N Cleaners*, 788 F.Supp. at 1331 (non-corporate context).

This distinction has particular relevance in the context of parent and subsidiary corporations where the theory of liability selected mandates different bases of proof. A finding of *owner* liability invokes the parent-subsidiary relationship and can be made only in circumstances that permit corporate veil piercing. *USX Corp.*, 68 F.3d at 823 ("[T]raditional principles of corporate law would not permit 'owner' liability to be extended to a corporate parent unless piercing the corporate veil were warranted."); *John S. Boyd Co.*, 992 F.2d at 408; *Lansford–Coaldale*, 4 F.3d at 1220; *Solvent Chem.*, 875 F.Supp. at 1019. Such *owner* liability is entirely distinct from parent *operator* liability, proof of which looks to the independent actions of the parent corporation, evidenced through its control over the polluting site.[5] *John S. Boyd Co.*, 992 F.2d at 408; *Lansford– Coaldale*, 4 F.3d at 1220; *Solvent Chem.*, 875 F.Supp. at 1019. As the Third Circuit has explained,

> Under CERCLA, a corporation may be held liable as an owner for the actions of its subsidiary corporation in situations in which it is determined that piercing the corporate veil is warranted.... Operator liability, in contrast, is generally reserved for those situations in which a parent or sister corporation is deemed, due to the specifics of its relationship with its affiliated corporation, to have had substantial control over the facility in question.

*Lansford–Coaldale*, 4 F.3d at 1220 (citations omitted). Any liabilities Union Camp may have as an *operator*, then, stem directly from its control over the plant. Unlike *owner* liability, the basis for such operator liability

---

5. The question of what control must be exercised by the parent corporation has received differing judicial responses. Some courts require *actual control* to sustain a finding of operator liability. *Lansford–Coaldale*, 4 F.3d at 1220; *Kayser–Roth*, 910 F.2d at 27. Other courts deem merely the *authority to control* sufficient. *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 842 (4th Cir.), *cert. denied*, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992); *United States v.*

*Carolina Transformer Co.*, 978 F.2d 832, 836–37 (4th Cir.1992). The Second Circuit has yet to endorse any approach to this question, and we decline to do so now, as such a ruling lies beyond the scope of the present appeal. The district court, having dealt only with issues relating to the indemnification agreement, never addressed the question whether Union Camp's own acts would subject it to CERCLA liability.

is wholly independent of any liability on the part of AmCre Corp.

An additional justification raised by courts in support of this characterization of operator liability looks to the statute's definition of "person." *See* 42 U.S.C. § 9601(21). "'[P]erson' is defined broadly to include a firm, corporation, or commercial entity, among other things. CERCLA's language, therefore, indicates an intent to hold a corporation liable for the environmental violations of its subsidiaries and sister corporations, if it is otherwise determined to have operated the facility in question." *Lansford–Coaldale,* 4 F.3d at 1221 n. 11; *see Kayser–Roth,* 910 F.2d at 26 n. 5.

While many courts thus find in the legislative intent, evidenced both generally and textually, a willingness to extend CERCLA liability beyond the established bounds of corporate common law, there is an alternative approach that strictly adheres to traditional veil-piercing concepts. *See United States v. Cordova Chem. Co.,* 59 F.3d 584, 590–91 (6th Cir.), *vacated,* 67 F.3d 586 (1995); *Joslyn Mfg. Co. v. T.L. James & Co.,* 893 F.2d 80, 82–83 (5th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991). In the absence of a more specific legislative direction, this school refuses to treat CERCLA as authorizing a departure from longstanding principles of corporate law. As the Fifth Circuit has emphasized, "Significantly, CERCLA does not define 'owners' or 'operators' as including the parent company of offending wholly-owned subsidiaries. Nor does the legislative history indicate that Congress intended to alter so substantially a basic tenet of corporate law." *Joslyn Mfg.,* 893 F.2d at 82.

■ Although we are not unmindful of the weighty concerns expressed by the Fifth and Sixth Circuits, we subscribe instead to the views adopted by the First, *see, e.g., John S. Boyd Co.,* 992 F.2d 401; *Kayser–Roth,* 910 F.2d 24; Third, *see, e.g., USX Corp.,* 68 F.3d 811; *FMC Corp.,* 29 F.3d 833; *Lansford–Coaldale,* 4 F.3d 1209; Fourth, *see, e.g., Carolina Transformer,* 978 F.2d 832 (independent, personal operator liability for corporate principals); Seventh, *see, e.g., Sidney S. Arst,* 25 F.3d 417 (direct operator liability for corporate officers and directors); Eighth, *see, e.g., TIC Inv. Corp.,* 68 F.3d 1082; and Eleventh Circuits, *see, e.g., Jacksonville Elec.,* 996 F.2d 1107; and of several district courts within this circuit, *see, e.g., Solvent Chem.,* 875 F.Supp. 1015; *Exxon,* 112 B.R. 540. A recognition of direct operator liability for parent corporations is both compatible with the statutory language and consistent with CERCLA's broad remedial scheme. Any operator liability that Union Camp may have, then, even though related to the activities of its subsidiary AmCre Corp.—the legal owner of the offending plant—is specific to Union Camp alone. Separate and distinct from "any obligation or liability of [AmCre Corp.]," Union Camp's potential operator liability thus falls outside the scope of the indemnification agreement.

### 2. Union Camp's Liability

■ The parties contest certain facts critical to the issue of Union Camp's liability as an operator under CERCLA. Specifically, they dispute (1) the degree of involvement by Union Camp's employees in negotiating the 1958 renewal of the contract concerning the plant's operations and (2) the control exercised by Union Camp's employees over AmCre Corp.'s capital expenditures. The parties debate whether there exists control sufficient for the imposition of operator liability. Such a determination, however, "requir[ing] an inherently fact-intensive inquiry"––especially where, as here, certain key facts are in dispute—presents a question of fact for resolution at trial. *Lansford–Coaldale,* 4 F.3d at 1222; *see United States v. Vertac Chem. Corp.,* 46 F.3d 803, 808 (8th Cir.1995); *FMC Corp.,* 29 F.3d 833, 845 (3d Cir.1994); *John S. Boyd Co.,* 992 F.2d at 408; *Prisco v. New York,* 902 F.Supp. 400, 409 (S.D.N.Y.1995).

### C. State Statutory Liability

■ Conn.Gen.Stat. § 22a–452 reads, in relevant part:

(a) Any person, firm, corporation or municipality which contains or removes or otherwise mitigates the effects of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous

wastes resulting from discharge, spillage, uncontrolled loss, seepage or filtration of such substance or material or waste shall be entitled to reimbursement from any person, firm or corporation for the reasonable costs expended for such containment, removal or mitigation, if such oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes pollution or contamination or other emergency resulted from the negligence or other actions of such person, firm or corporation.

The statute thus provides a private right of action for reimbursement of environmental clean-up costs. Unlike CERCLA's strict liability standard, Section 22a–452 "require[s] a showing of culpability and not merely causation." *Connecticut Resources Recovery Auth. v. Refuse Gardens, Inc.,* 229 Conn. 455, 642 A.2d 697, 698 (1994); *see Warner v. Kedah Corp.,* No. 07 29 64, 1995 WL 573828, at \* 6 (Conn.Super.Ct. Sept. 20, 1995).

■ However, like CERCLA, the Connecticut statute is remedial legislation whose language should be construed liberally to effectuate its purpose. *See Blackburn v. Miller–Stephenson Chem. Co., Inc.,* No. 31 40 89, 1995 WL 23543, at \* 9 (Conn.Super.Ct. Jan. 12, 1995). Its broad language, specifically the references to "any person, firm or corporation," supports an interpretation of Section 22a–452 whereby a parent corporation may incur direct responsibility for environmental harm. While the statute's culpability requirement requires a specific showing before liability may be imposed on a parent corporation, this requirement, necessitating an examination of individual, independent actions, lends additional support to a statutory reading of direct parent liability. Such an interpretation is also plainly compatible with the statute's remedial scheme.

■ Thus, like CERCLA operator liability, whatever obligations Union Camp may have under the Connecticut statute are distinct from any responsibility incurred by Am-Cre Corp. As a determination of Section 22a–452 liability necessitates a fact-based inquiry, *Chromium Process Co. v. Yankee Gas Serv. Co.,* No. CV 92 03 85 32, 1995 WL 404987, at \* 6 (Conn.Super.Ct. June 23, 1995), Union Camp's state statutory liability is to be assessed at the trial-court level.

### Conclusion

The order of the district court entered June 1, 1995, pursuant to its opinion of August 25, 1994, is vacated. The case is remanded for a determination of Union Camp's liability under CERCLA § 9607(a)(2) and Conn.Gen.Stat. § 22a–452.