**SEALY CONNECTICUT, INC., Plaintiff,**

v.

**LITTON INDUSTRIES, INC., et al., Defendants.**

**No. CIV. 3:94CV711 (JBA).**

United States District Court, D. Connecticut.

March 3, 1998.

Peter M. Nolin, Hebb & Gitlin, Hartford, CT, Franca L. Derosa, Brown, Rudnick, Freed & Gesmer, Hartford, CT, for Sealy Connecticut, Inc., Plaintiffs.

Thomas J. Byrne, Thomas A. Rouse, Pullman & Comley, Bridgeport, CT, for Litton Industries, Inc., Litton Systems, Inc. dba Winchester Electronics Division.

James G. Green, Jr., Pepe & Hazard, Hartford, CT, Daniel Thomasch, Stephen G. Foresta, Orrick, Herrington & Sutcliffe, New York, NY, for EKCO Housewares, Inc.

Sharon A. Cregeen, David J. McDonald, James Edward O'Donnell, O'Donnell, McDonald & Cregeen, Westport, for U.S. Baird Corp.

## RULING ON SUMMARY JUDGMENT MOTION [Doc. 90]

ARTERTON, District Judge.

### INTRODUCTION

This action arises from the contamination of real property located in Oakville, Connecticut (the "Site"). Plaintiff Sealy Connecticut, Inc. ("Sealy") is the present owner of the property. Defendants are various entities who are alleged to have formerly operated industrial facilities on the site, or who are alleged to stand as corporate successors to such entities. Plaintiff brings suit under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–9675 ("CERCLA"), the Resource Conservation and Recovery Act, 42 U.S.C. § 6972, and several state law theories of action. Defendant U.S. Baird Corporation f/k/a The Baird Machine Company ("Baird") moves for summary judgment as to its liability as an "operator" of the site from 1912 to 1958, during the time period the Autoyre Company ("Autoyre") owned and operated a facility on the site.[1]

Sealy alleges that Baird owned the site between 1894 and 1912, during which time Baird used the site for manufacturing machinery and other products. Thereafter, ownership passed to the Autoyre Company ("Autoyre"), which owned the site until 1958. Sealy alleges that during Autoyre's ownership of the site, Baird had substantial control over the Autoyre facility, thus subjecting Baird to liability as an operator of the Site. After Autoyre relinquished ownership of the site, an affiliate of defendant Litton used the property for electroplating operations between 1959 and 1991. Initially, Litton leased the site from entities who are not parties to the present action. In 1986, Sealy became owner of the site and Litton's lessor for the final years of the lease.

### SUMMARY JUDGMENT STANDARD

A party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, (1970). When a court is confronted with facts that permit several different conclusions, all inferences from the underlying facts must be drawn in the non-movant's favor. *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). The trial court must bear in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the movant demonstrates an absence of material issues of fact, a limited burden of production shifts to the non-movant, which must "demonstrate more than 'some metaphysical doubt as to the material facts,' ... [and] must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993) (citations and emphasis omitted). Summary judgment, then is granted only when "there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), or, in other words, only if "no rational jury could find in favor of the

---

1. Sealy joins in Litton Industries, Inc.'s ("Litton") (i) Statement of Disputed Material Facts Re U.S. Baird Corporation, and (ii) Memorandum of Law in Opposition to Baird's Motion for Partial Summary Judgment.

nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). The trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.*

## DISCUSSION

CERCLA imposes liability on any person who at the time of disposal of any hazardous substance owned or operated any facility at which such disposal took place. 42 U.S.C. § 9607(a)(2). "Owner" or "operator" means any person owning or operating such facility, and "person" includes an individual, firm, corporation, association, partnership, consortium, joint venture or commercial entity. § 9601(20)-(21). Consistent with the expansive remedial purpose of CERCLA, namely to extend liability to all those involved in environmental harm, under that statute courts have held parent corporations independently liable, as operators, for the activities of their subsidiaries. *Schiavone v. Pearce*, 79 F.3d 248, 253 (2d Cir.1996). In fact, a parent and its subsidiary have both been found independently liable for environmental damage from the same activity as operator and owner respectively. *Id.* at 254 (citing *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833 843 (3rd Cir.1994)).

A finding of owner liability invokes the parent-subsidiary relationship and can be made only in circumstances that permit corporate veil piercing.... [citations omitted]. Such owner liability is entirely distinct from *parent operator liability*, proof of which looks to the independent actions of the parent corporation, evidenced through its control over the polluting site.

*Id.* (citations omitted) (emphasis added). Although the Second Circuit has not yet decided the degree of control required to demonstrate the operator liability of a parent resulting from its relationship with a subsidiary, it has provided some guidance on that issue in *Certain Underwriters at Lloyd's London v. St. Joe Minerals Corporation*, 90 F.3d 671, 674 (2d Cir.1996), noting that "more is required than simple ownership and the general authority or control that comes with it. At a minimum there must be 'active involvement in the activities of the subsidiary.'" *Id.* (quoting *United States v. Kayser-Roth*, 910 F.2d 24 (1st Cir.1990)).

In its summary judgment motion, Baird's sole contention is that, as a matter of law, it cannot be held independently liable under CERCLA as an operator of the site, and that the undisputed facts demonstrate that it had no active involvement the activities of Autoyre which would subject it to such liability. It is undisputed that Baird operated a business at the site north of Riverside Avenue in Oakville, Connecticut from September 6, 1984 until July 8, 1912, manufacturing production equipment machinery to perform mass production of wire formed and pointed articles. (Baird Factual Statement, ¶¶ 1-2; Litton/Sealy Factual Statement, ¶ 1). It is further undisputed that in 1912, the directors and officers of Baird were Arthur J. Lewis, B.C. Warner and Charles L. Warner, and that in July of that year, Baird moved its business from the Oakville site to its present Stratford, Connecticut location. (Baird Factual Statement, ¶¶ 3-5; Litton/Sealy Factual Statement, ¶ 1). Autoyre was incorporated June 8, 1912 by Julius H. Cowles, Raymond G. Stewart and Frederick M. Peasly. (*Id.*).

Although Baird concedes that it owned a majority of Autoyre's stock as payment for both the transfer of the site to Autoyre, and for other assets to operate that business, it submits that the day-to-day operations of the business were conducted at its Oakville site by R.G. Stewart, its General Manager from the time Autoyre was formed until 1936, when he was replaced by Philip B. Shailer pursuant to an employment agreement with him dated September 22, 1936. (Blaisdell-Snowden Aff., Exs. H; V).

Baird also emphasizes the importance of Shailer's independent management of Autoyre—particularly with regard to increasing Autoyre's sales of a new "Parva buckle" line which included the purchase of American Buckle Company—as demonstrated by Baird's purchase of life insurance on Shailer. (Seyfert Deposition at 114; Blaisdell-Snow-

den Aff., Exs. H, ¶ 4; J; P). Additionally, Baird stresses that Shailer had numerous options to purchase Autoyre stock, and in fact purchased Autoyre stock in an amount nearly equal to that owned by Baird. (Blaisdell–Snowden Aff., Exs. H; O; Foresta Aff., Ex. A[2]). Baird maintains the undisputed record shows that it did not "actively exercise" its rights as owner of the Autoyre stock, but instead held the stock nominally registered in the name of other individuals, such as the Warner family, and that even when stock certificates were issued in Baird's name rather than that of its nominees, members of the Warner family were authorized by Baird to vote its holdings in common stock at Autoyre stockholders meetings. (Blaisdell–Snowden Aff., Ex. P).

Notwithstanding Baird's concession that the financial records and that of Autoyre were submitted to a common officer, B.J. Calkins, at his office located at the Baird Machine Company premises in Stratford, Baird stresses that the financial records of each company were kept in completely distinct form, and separate financial reports were filed for each company. (Seyfert Deposition at 27–28). Further, according to George A. Seyfert, a certified public accountant with Milton Friedberg who worked on the accounts of both Baird and Autoyre (and later was hired by Autoyre), no employees of Autoyre and Baird overlapped, and the Autoyre departmental managers such as himself, George Troendly, Plant Manager and Stewart Loveridge, Manager of Sales and Marketing, reported to Shailer and not to Baird officers. (Seyfert Deposition at 35–37). Seyfert also testified that he had never seen Baird officers Leon Warner or B.J. Calkins at the Autoyre plant in Oakville. (Seyfert Deposition at 116–18). In short, Baird maintains that Autoyre was managed by R.G. Stewart, and then Shailer, until it was acquired by Ekco in 1954, and that it was not actively involved in the operations of Autoyre as required by *St. Joe Minerals.* Instead, Baird casts its involvement with Autoyre as merely a parent interested in its investment.

Several of the material facts determinative of whether Baird exercised sufficient control over Autoyre, such that it may be held liable as an operator of the site, are disputed on this record. In particular, at the time Autoyre was formed, R.G. Stewart, its first president, was a Baird employee to whom Baird loaned money to purchase Autoyre stock. (Blaisdell–Snowden Aff., Ex. V at 1091 [Decision of U.S. Board of Tax Appeals]). Baird also advanced Autoyre funds with which to operate, and furnished it with machinery. Further, Litton and Sealy contend that the Board of Tax Appeals opinion submitted by Baird supports their claim that Baird was actively involved in Autoyre's activities, and the Board's findings that some Baird employees also worked for Autoyre and that Autoyre's operation and management were directed by Baird, stand in contrast to Seyfert's testimony that no employees of the two companies overlapped.

As Baird concedes, from 1937 to 1952 all of Autoyre's financial records were maintained by Baird at its Stratford headquarters, and during that same period, B.J. Calkins, an officer and management employee of both Baird and Autoyre supervised the financial management of both companies, including the outside auditing of Milton Friedberg. (Seyfert Deposition at 20–26). Moreover, during that same period, Autoyre's legal affairs were handled by outside counsel retained "through Baird Machine," namely Al Greenspun who was Baird's general counsel. (Seyfert Deposition 42–43). In 1954, Baird's president, Leon Warner and Greenspun negotiated the sale of all outstanding Autoyre capital stock to Ekco, and Warner executed the stock purchase agreement with Ekco as attorney-in-fact for all shareholders of Autoyre, except Warner himself and Shailer. (Seyfert Deposition at 62–63; Foresta Aff., Ex. A). If proven at trial, a rational jury could draw the inference from these asserted facts that Autoyre's management was under the authority of Baird, and beholden to its directives.

In *Schiavone,* certain high ranking officers of the subsidiary were also employed by the

---

**2.** The Foresta Affidavit, referred to in Litton/Sealy's Rule 9(c) Statement, is in the record attached to Ekco's Rule 9(c) Statement in Support of its Motion for Summary Judgment.

parent company, the parent's legal department rendered services to the subsidiary—including contract negotiations and approval—and the parent's board of directors approved and examined the subsidiary's capital expenditures. 79 F.3d at 251. The Second Circuit reversed the District Court's grant of summary judgment on the parent's claim that it was not liable under CERCLA as an operator of the site, concluding that the dispute raised by these material facts precluded summary judgment as to whether the parent had sufficient control over its subsidiary for imposition of CERCLA operator liability.

Such a determination, however, "requir[ing] an inherently fact-intensive inquiry"—especially where, as here, certain key facts are in dispute—presents a question of fact for resolution at trial.

*Id.* at 255 (citation omitted) (alteration in original). *See also Lansford–Coaldale Joint Water Authority v. Tonolli Corporation,* 4 F.3d 1209 (3d Cir.1993) (factual findings required regarding overlapping officer/employee of parent and subsidiary as to whether parent was liable as operator under CERCLA).

Here, as in *Schiavone,* Litton and Sealy have demonstrated specific facts showing a genuine issue for trial as to Baird's liability as operator of the site from 1912 to 1958 by producing factual support that (1) Autoyre's first president was a Baird employee, (2) other employees were employed by both Autoyre and Baird, (3) control of Autoyre's financial records was reposed in Baird, (4) Baird's legal counsel represented Autoyre, including in negotiations for the 1954 stock sale to Ekco, and (5) Autoyre's management was influenced by Baird, i.e., Warner's execution of the stock sale on behalf of Autoyre shareholders. These facts contest Baird's factual submissions that it did not exercise control over Autoyre's activities during the relevant period.[3]

---

**3.** Baird contends that in order for plaintiff to sustain its non-CERCLA claims it must prove that Autoyre's corporate entity should be disregarded, thus imposing liability on Baird as a stockholder, and it argues somewhat conclusorily that there is no evidence indicating any basis upon which Autoyre's corporate form could be disregarded under "traditional corporate law

Therefore, in light of Litton's and Sealy's submission of factual support for their case, the Court concludes that a factual dispute exists such that a rational jury could find that Baird was an operator of the site during the relevant period. Accordingly, Baird's Motion for Summary Judgment [doc. # 90] is DENIED.

IT IS SO ORDERED.

doctrines." (Baird Mem. at 9). Baird, however, provides the Court with no analysis of such doctrines as applied to the record, nor demonstrates the applicability of either the "instrumentality rule" or the "identity rule," the two methods by which a corporate entity may be disregarded under Connecticut law. *See Saphir v. Neustadt,* 177 Conn. 191, 210, 413 A.2d 843 (1979).