**GREATER EASTERN TRANSPORT LLC, Plaintiff,**

v.

**WASTE MANAGEMENT OF CONNECTICUT, INC., Defendants.**

No. 00 CIV. 4865(VM).

United States District Court, S.D. New York.

July 19, 2002.

Franklin B. Velie, Mark H. Goldey, Salans, Hertzfeld, Heilbronn, Christy & Viener, New York City, for plaintiff.

Frederick S. Gold, Shipman & Goodwin, LLP, Stamford, CT, for defendant.

### DECISION AND ORDER

MARRERO, District Judge.

Greater Eastern Transport ("GET") brought this action, invoking the Court's diversity jurisdiction under 28 U.S.C. § 1332, against Waste Management of Connecticut, Inc. ("Waste Management") alleging breach of contract and breach of the implied duty of good faith and fair dealing. Waste Management asserted counterclaims for breach of contract and breach of the implied duty of good faith and fair dealing and now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons set forth below, Waste Management's motion is granted in part and denied in part.

### I. BACKGROUND

On or about August 30, 1999, Waste Management and GET entered into a subcontractor service agreement. (Subcontractor Service Agreement, dated Aug. 30, 1999 ("Agreement"), Declaration of Clay J. Pierce, dated May 13, 2002 ("Pierce's Decl."), Ex. A.) Under the Agreement, GET undertook to transport waste, at a rate of $14.25 per ton, from the municipal waste transfer station in Stamford, Connecticut, which is operated by Waste Management, to various disposal sites designated by Waste Management, including Peekskill, New York, and Essex County, New Jersey. (Agreement ¶¶ 1, 9.) The contract was for a term of five years and contained the following termination clause:

> In the event [Waste Management] no longer utilizes its Stamford transfer station for transferring Waste, [Waste Management] may terminate this agreement upon thirty (30) days prior written notice; or upon ninety days prior written notice to GET. This agreement may not otherwise be terminated except as set forth above.

(Agreement ¶ 11.)

The Agreement entitled Waste Management to designate "additional disposal facilities, and additional transfer stations in Connecticut provided that an equitable adjustment be made in the per ton rate as set forth below." (Agreement ¶ 1.) Such an equitable adjustment was to be negotiated "in good faith ... based on the change in actual over the road miles." (Agreement ¶ 9.) The Agreement also provided for an annual price adjustment in the transport rate based on the percentage change in the Consumer Price Index ("CPI"). (Agreement ¶ 9.)

In the year after they entered into the Agreement, Waste Management instructed GET to deliver waste to facilities in Bridgeport, Connecticut and the Bronx, New York. (Complaint, dated June 30, 2000, ¶ 14.) Waste Management and GET successfully negotiated transport rates for these additional facilities by adjusting the $14.25 per ton rate by the change in actual over the road miles. (*Id.*) The rate remained the same for the facility in the Bronx "because the distance and time required to transport trailers to the Bronx approximated the time required to ship to Peekskill or Essex County" and was lower for the Bridgeport facility "because of the relatively short distance between Stamford and Bridgeport." (*Id.*)

In the Spring of 2000, Waste Management instructed GET to deliver waste to a facility in Scranton, Pennsylvania. (*Id.* at ¶ 15.) Negotiations over an equitable adjustment to the rate for transporting the waste to this site failed. (*Id.* at ¶ 20.) On or about May 10, 2000, Waste Management, without providing notice to GET, placed drivers and truck tractors from another company called Upstate ("Upstate"), one of GET's competitors, at the Stamford transfer station and instructed GET only to load the trailers at a rate of $4.00 per ton and not to transport the waste. (*See id.* at ¶¶ 21–25.) In a letter dated June 8, 2000, Waste Management gave GET ninety days notice that it was terminating the Agreement effective September 11, 2000. (*Id.* at ¶ 26; Letter from Paul Penograth to Martin Sternberg, dated June 8, 2000 ("Termination Letter"), Pierce's Decl., Ex. F.)

On June 30, 2000, GET filed its complaint in this action, alleging that Waste Management breached the contract and the implied duty of good faith and fair dealing when it (1) refused to negotiate a reasonable rate for transferring waste to the Scranton, Pennsylvania transfer station; (2) placed the Upstate drivers at the Stamford transfer station; and (3) terminated the contract with the Termination Letter. (*Id.* at ¶¶ 28–37.) In its Answer dated August 28, 2000, Waste Management asserted counterclaims for breach of contract and of the implied duty of good faith and fair dealing. (Answer ¶¶ 12–17.) Waste Management now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).

Waste Management contends that "the clear language of the Agreement gave Waste Management the right to terminate it upon ninety days prior written notice." (Defendant's Memorandum of Law in Support of Motion for Summary Judgment, dated Apr. 5, 2002 ("Def.'s Mem."), at 6.) It further argues that the Agreement became an "unenforceable agreement to agree" when Waste Management added the Scranton, Pennsylvania facility. (*Id.* at 16 (internal quotations omitted).) Finally, Waste Management argues that GET is barred from recovering lost profits. (*Id.*)

GET counters that the agreement is ambiguous and that the Court therefore must examine extrinsic evidence. GET claims this evidence demonstrates that Waste Management did not have the right to terminate the contract upon ninety days prior written notice. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated May 13, 2002 ("Pl.'s Mem."), at 9–12.) GET further argues that the Agreement has clear language providing a basis for determining the rate for transporting waste to an additional disposal facility and that the Agreement therefore is not indefinite. (*Id.* at 14–16.)

## II. *DISCUSSION*

### A. *CHOICE OF LAW*

■ Because the Court's jurisdiction in this action is based on diversity of citizen-

ship among the parties, the Court must first consider its choice-of-law. The Court employs the choice-of-law rules of New York, the forum state, in determining whether to apply Connecticut or New York law in this case. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York law, the Court must first determine whether there is a conflict between the law of the two states. *See Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393–94 (2d Cir.2001). As regards the issues discussed herein, there is no major difference between the laws of Connecticut and New York. Connecticut and New York law both dictate that unambiguous contract terms should be enforced according to their terms. *Compare Tallmadge Bros., Inc.* 252 Conn. 479, 746 A.2d 1277, 1288 (2000) *with Uribe v. Merchants Bank of N.Y.,* 91 N.Y.2d 336, 670 N.Y.S.2d 393, 693 N.E.2d 740, 743 (1998). Also, both states require courts to enforce seemingly indefinite contract terms if parties have partially performed them or if the contract contains some mechanism through which courts can determine the missing term. *Compare Augeri v. C.F. Wooding Co.,* 173 Conn. 426, 378 A.2d 538, 540 (1977) *with 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.,* 78 N.Y.2d 88, 571 N.Y.S.2d 686, 575 N.E.2d 104, 105–06 (1991) *and Barnard Bakeshops, Inc. v. Dirig,* 173 Misc. 862, 19 N.Y.S.2d 224, 228 (N.Y.1940). Because there is no actual conflict between the laws of the two states, the Court need not engage in a choice of law analysis. *See Fieger,* 251 F.3d at 393–94.

## B.  *STANDARD OF REVIEW*

A motion for summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). In a breach of contract action, summary judgment is appropriate where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning. *See Schiavone v. Pearce,* 79 F.3d 248, 252 (2d Cir.1996).

## C.  *TERMINATION PROVISION*

Waste Management moves to dismiss the third count of GET's complaint, claiming that the Agreement allowed Waste Management to terminate the contract for any reason upon ninety days prior written notice. (Def.'s Mem. at 6.) The Court grants this part of Waste Management's motion. Under Connecticut law:

> A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract . . . . [A]ny ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.

*Tallmadge Bros. Inc.,* 746 A.2d at 1288 (internal quotations omitted). Contract language is considered unambiguous when it is "clear and conveys a definite and precise intent." *United Illuminating Co. v. Wisvest Connecticut LLC,* 259 Conn. 665, 791 A.2d 546, 550 (2002). Moreover, "where two clauses which are apparently inconsistent may be reconciled by a reasonable construction, that construction must be given, because it cannot be assumed that the parties intended to insert

inconsistent and repugnant provisions." *Regency Savs. Bank v. Westmark Partners*, 59 Conn.App. 160, 756 A.2d 299, 302–03 (2000).

■ GET explains that the thirty-day and ninety-day termination provisions are in direct conflict due to a drafting error that renders the entire clause ambiguous, and argues that the Court therefore should examine extrinsic evidence in ascertaining the meaning of the contract and the parties' intent. (Pl.'s Mem. at 5, 9–11.) *See Lee v. BSB Greenwich Mortgage Ltd. P'ship*, 267 F.3d 172, 178 (2d Cir.2001) (applying Connecticut law and noting that a court may examine extrinsic evidence in construing a contract only when the contract is ambiguous). The Court disagrees.

■ The ambiguity GET alleges does not "emanate from the language of the agreement," but from GET's "subjective interpretation of that language." *Tallmadge Bros. Inc.*, 746 A.2d at 1288. The construction that GET propounds is not consistent with Connecticut or New York law, both of which require the Court to read meaning into each provision of a contract, if possible. *See Regency Savs. Bank*, 756 A.2d at 302–03; *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985) ("Interpretation that gives reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves part unreasonable or of no effect."). GET expressly asserts that, under its reading of the contract, either the thirty day or the ninety-day termination provision is ineffective. (Pl.'s Mem. at 9–10 (arguing that the Termination Clause "appears to suggest the nonsensical: that in the event that Waste Management no longer utilizes the transfer station, Waste Management may terminate the agreement 'upon thirty days prior

written notice' or 'upon ninety days prior written notice to GET' ").) This proposition · is not viable in the face of Waste Management's interpretation, which gives effect to the language of the entire termination provision.[1] *See Regency Savs. Bank*, 756 A.2d at 302–03. As discussed below, Waste Management correctly argues that the language of the Termination Clause unambiguously sets forth two alternative termination notice procedures, one upon thirty days prior written notice in the event that Waste Management is no longer using the Stamford facility, the other for any reason upon ninety days prior written notice.

The use of the word "or" before the ninety-day termination provision indicates that it expresses an alternative to the preceding thirty-day termination provision. The Oxford English Dictionary defines "or" as, "a particle co-ordinating two (or more) . . . clauses, between which there is an alternative." 10 *Oxford English Dictionary* 882 (2d ed.1989). In the instant case, the alternative is between two termination provisions, one conditional on Waste Management no longer using the Stamford facility, the other not.

The punctuation of the clause also indicates that there are two separate termination provisions. As one court noted:

> While the presence or absence of punctuation, generally cannot control the construction of plain language, once the sense of a contract has been gathered from its language, punctuation may be more readily used to assist in reading the contract to effectuate the contract purposes of the parties and to confirm its meaning.

*Shoreline Care Ltd. v. Town of North Branford*, No. CV–92–03316958, 1993 WL

---

1. GET's contention of ambiguity does not, in and of itself, establish that the provision is ambiguous. *See United·Illuminating Co.*, 791 A.2d at 550.

197773, at \*3 (Conn.Super.Ct. June, 1993) (noting that the court's conclusion regarding the clear and unambiguous language of the contract was "strengthened . . . because of the comma . . . ."), *rev'd on other grounds,* 231 Conn. 344, 650 A.2d 142 (1994).

Here, the semicolon before the phrase "or upon ninety days prior written notice" indicates that the clause is independent from that which precedes it. *See Amusement Consultants, Ltd. v. Hartford Life Ins. Co.,* 214 A.D.2d 442, 625 N.Y.S.2d 901, 902 (App. Div. 1st Dep't 1995). In *Amusement Consultants,* there was a dispute over the following list: "[a]ll active full time home office employees, officers, managers, supervisors, mechanics, technicians, routemen and carpenters." *Id.* at 442, 625 N.Y.S.2d 901. The court found that inserting a semicolon between the terms "home office employees" and "officers" would have meant that the modifier "active full time" applied only to "home office employees."[2] *Id.* at 443–44, 625 N.Y.S.2d 901. Similarly, in the instant case, the semicolon after the thirty-day termination provision indicates that the modifier "[i]n the event [Waste Management] no longer utilizes its Stamford transfer station for transferring Waste," applies only to that first condition. In that context the word "or" effectively connotes a meaning of "otherwise," in other words, an alternative that does not contemplate the qualifying prerequisite of Waste Management ceasing to operate the Stamford facility. *See also* Diana Hacker, *Rules for Writers: A Brief Handbook* § 34(d), at 295 (4th ed. 2000) ("Semicolons are generally not used before 'or' but occasionally 'may be used to emphasize . . . a firm distinction between clauses joined with a coordinating conjunction.'")

This construction of the Termination Clause presents two methods of ending the contract and thus gives effect to the entire provision and the parties' expectations on the basis of the contract language itself. *See Tallmadge Bros. Inc.,* 746 A.2d at 1288. While in connection with the instant motions it is not within the function of the Court to pass upon what the parties intended to achieve by the language of the Termination Clause, by way of illustrating a point here, the Court suggests one conceivable reading. The provision may reflect a reasonable purpose of the parties to afford Waste Management greater control over its waste disposal operations and enable it to minimize its obligations to a subcontractor—by means of a shorter termination period—at a time it was not using the Stamford facility than when it was. Conversely, a longer termination period plausibly could benefit GET in the event Waste Management continued to operate the Stamford facility. The point suggested is that conferring to the entire clause a meaning and corresponding intent that provides two termination alternatives is consistent with an interpretation under which both parties, without resort to extrinsic evidence, could realize contractual expectations. *See Regency Savs. Bank,* 756 A.2d at 302–03.

GET's reading, on the other hand, requires a determination that effectively nullifies some language of the Agreement as either meaningless or surplusage, and to that extent, solely on the basis of one party's subjective interpretation, frustrates a plausible construction of the entire clause and the expectations associated with such a complete provision. *See Tallmadge Bros. Inc.,* 746 A.2d at 1288; *Regency Savs. Bank,* 756 A.2d at 302–03. Such a construction introduces into the Termi-

---

**2.** There was no semicolon in the contract, and the court therefore found that the phrase "ac-tive full time" modified each term in the list. *See id.*

nation Clause an alternative—limiting the provision to only one option—that on its face is not only not contemplated, but also conflicts with the language of the clause's last sentence, which reads: "This agreement may not otherwise be terminated except as set forth above." *See Tallmadge Bros. Inc.*, 746 A.2d at 1288; *Regency Savs. Bank*, 756 A.2d at 302–03.

Accordingly, the Court concludes that the plain language of the contract provides two separate termination provisions: one which is applicable if Waste Management continues to operate the Stamford facility, the other which is applicable if it does not; and that Waste Management therefore properly terminated the contract with the Termination Letter. Waste Management's motion for summary judgment is granted with respect to the third count of GET's complaint.[3]

## D. *AGREEMENT TO AGREE*

■ Waste Management moves to dismiss the first two counts of the Complaint, claiming that the contract became an unenforceable "agreement to agree" upon Waste Management's attempt to add the Scranton, Pennsylvania transport site. (Def.'s Mem. at 16.) The Court denies this part of Waste Management's motion.

■ There is a presumption that the language used by sophisticated commercial parties, such as the parties in this case, is definitive. *See United Illuminating Co.*, 791 A.2d at 550. Moreover, if parties so intend, they may reach a binding agreement even if they leave some essential terms indefinite. *See Willow Funding Co. v. Grencom Assocs.*, 63 Conn.App. 832, 779 A.2d 174, 182 (2001). Whether or not a contract is definite enough to be enforce-

able depends on the particular circumstances of each case. *See id.* at 182. Additionally, if "the promise on one side of an agreement [is] too indefinite and vague for enforcement, such a promise may be made definite by entire or partial performance by that side." *Augeri v. C.F. Wooding Co.*, 173 Conn. 426, 378 A.2d 538, 540 (1977). Finally, a seemingly indefinite contract term can be enforced "as long as there is some objective benchmark against which to measure the scope of the parties' contractual undertaking." *Artman v. Output Tech. Solutions E. Region, Inc.*, No. CV 000595362S, 2000 WL 992166, at *2 (Conn.Super. June 30, 2000) (quoting *Meaney v. Conn. Hosp. Ass'n*, 250 Conn. 500, 735 A.2d 813, 825 (1999)).

The Agreement's provision regarding the designation of additional disposal facilities is not indefinite both because the parties have previously acted upon it and because the Agreement provides an objective method for determining the transport rate for the Scranton facility. In the Fall of 1999, Waste Management specified an additional disposal facility in Bridgeport, Connecticut, to which GET transported waste "at a rate lower than $14.25/ton because of the relatively short distance between Stamford and Bridgeport." (Complaint ¶ 14.) Waste Management also requested that GET haul waste to the Harlem River Railyard in the Bronx, New York, which GET did at a rate of $14.25/ton "because the distance and time required to transport trailers to the Bronx approximated the time required to ship to Peekskill or Essex County." (*Id.*) Waste Management presents no reason why the standards that served the parties in reaching agreement with respect to transport of waste to the other additional facilities were

---

**3.** Waste Management admits that it gave ninety days notice only after the acts alleged in Counts (1) and (2). (Def.'s Mem. at 6 n. 3.)

The Court considers the motion to dismiss the first two counts below.

any more definite and could not be used as well to apply to establishing a measure relevant to the Scranton site. Because the parties have negotiated, reached agreement and already performed with respect to the disputed contract provision, a basis exists to find that it is definite and enforceable.

Moreover, the Agreement is enforceable because it provides an objective method for determining rates for transporting waste to new facilities. *Compare Meaney*, 735 A.2d at 819 (holding that implied contract where "parties did not identify an industry standard or other objective benchmark" was unenforceable) *with Artman*, 2000 WL 992166, at *2 (holding that an employment contract containing a bonus rate of "three percent (3%) of the 1995 EBIT," but subject to change at the supervisor's discretion, was enforceable because it contained an objective benchmark of "three percent"). The Agreement in the instant case contains several objective benchmarks, including the $14.25 per ton rate specified in the contract, the change in actual over-the-road miles and the CPI. (Complaint ¶¶ 5, 9.) The distance from Stamford, Connecticut to Scranton, Pennsylvania is approximately four and a half times that to Peekskill, New York (one of the sites in the Agreement). (Complaint ¶ 15.) The parties should have been able to adjust the Peekskill rate to determine the appropriate price for transporting waste to the Scranton facility, as they did when they determined the appropriate factors that enabled them to agree upon rates for the Bridgeport and Harlem River Railyard facilities. Because the Agreement contains objective methods for determining the rate for transport to additional facilities, the Court concludes that it is enforceable. Accordingly, Waste Management's motion to dismiss is denied with respect to the first and second counts of GET's complaint.

### E.  *DAMAGES*

Waste Management further argues that there can be no recovery for the lost profits resulting from any breach prior to its termination of the contract because "the damages are too speculative to be recovered." (Def.'s Mem. at 18.) The Court denies this part of Waste Management's motion because it has found that the contract terms were not indefinite and that there is a reasonable mechanism for determining the price for added facilities. *See Torosyan v. Boehringer Ingelheim Pharm.*, 234 Conn. 1, 662 A.2d 89, 105 (1995).

The Court agrees with Waste Management, however, that "any damages resulting from [any] breaches would be cut off as of the effective date of the termination." (Pl.'s Mem. at 6 n. 3.) GET cannot recover damages for any time beyond Waste Management's valid termination of the contract because GET elected to continue in the contract. The contract therefore was not terminated by Waste Management's alleged breach. As another court in this district noted:

> When a party materially breaches a contract, the non-breaching party must choose between two remedies—he can elect to terminate the contract and recover liquidated damages or he can continue the contract and recover damages solely for the breach. A party can indicate that he has chosen to continue the contract by continuing to perform under the contract or by accepting the performance of the breaching party. Once a party elects to continue the contract, he can never thereafter elect to terminate the contract based on that breach although he retains the option of terminating the contract based on other, subsequent breaches.

*Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1011 (S.D.N.Y.1995) (internal citations omitted); *cf. Nemeth/Martin Consulting, Inc.*, 2002 WL 960019, at *2 (Conn.Super. Apr.17, 2002) (holding that parties assented to the continuation of a contract by continuing to perform).

Because GET continued to perform and accept Waste Management's performance after the first alleged breach, GET cannot now terminate upon that breach. The contract was finally terminated by Waste Management's Termination Letter. Therefore, GET can recover damages only in an amount equal to the contract value less the amount actually paid, for the time between the first alleged breach and September 11, 2000, when Waste Management properly terminated the contract. *See Silver v. I Goldberg & Partners, Inc.*, No. 92 Civ. 6989(HB), 1994 WL 760739, at *1 (S.D.N.Y. Dec.22, 1994) (applying New York law and limiting plaintiff's damages to the period between his removal from his company's health care plan and the total cessation of the company's plan sixteen months later, even though his original contract was for ten years of coverage).

Accordingly, Waste Management's motion to limit any damages recoverable by GET to the period between any alleged breach and September 11, 2000, when Waste Management properly terminated the contract, is granted.

## III. *CONCLUSION AND ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that Defendant's motion for summary judgment on the applicability of the ninety-day termination provision in the contract herein is GRANTED; and it is further

**ORDERED** that Defendant's motion for summary judgment on the unenforceability of the contract is DENIED; and it is further

**ORDERED** that Defendant's motion to limit damages as specified herein is GRANTED.

**SO ORDERED.**