USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2150 THE JOHN S. BOYD COMPANY, INC., ET AL., Plaintiffs, Appellees, v. BOSTON GAS COMPANY, ET AL., Defendants, Appellees, ____________________ NEW ENGLAND ELECTRIC SYSTEM, ET AL., Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge] ___________________ ____________________ Before Torruella, Cyr and Boudin, Circuit Judges. ______________ _____________________ Scott P. Lewis, with whom Palmer & Dodge, and John F. _______________ ________________ ________ Sherman III, were on brief for appellants. ___________ Gerald P. Tishler, with whom James W. Stoll, Jonathan J. __________________ ______________ ___________ Kane, Brown, Rudnick, Freed & Gesmer, Lawrence E. McCormick, and ____ _______________________________ _____________________ Wendy B. Levine, were on brief for appellees. _______________ ____________________ May 26, 1993 ____________________ TORRUELLA, Circuit Judge. In this appeal we determine _____________ whether appellants must pay the entire cost of cleaning up two different environmental hazards: coal gas waste and oil gas waste. As the district court correctly apportioned liability under the governing principles of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. 9601 et seq., and the Massachusetts Superfund Act, Mass. _______ Ann. L. ch. 21E (1993), we affirm. FACTS FACTS _____ The Lynn Gas Light Co. began manufacturing gas in Massachusetts in the mid-1800's. The Lynn Electric Light Co., an electric utility, began operation some thirty years later. These companies merged in 1888, by legislative decree, to form the Lynn Gas and Electric Co. That company continued to manufacture gas from coal ("coal gas") in large quantities until 1951, when natural gas became available. After that date, Lynn Gas and Electric Co. and the successor to its gas business manufactured gas from oil ("oil gas") in small quantities, to supplement the supply of natural gas during peak periods of use. This manufacture, called peak shaving, continued until 1972. New England Electric System ("NEES"), a holding company owning various utilities and an appellant in this case, bought about 97% of the Lynn Gas and Electric Company in 1957. In 1959, NEES created a new company, called the Lynn Gas Co., and structured a transaction between the new company and the Lynn Gas and Electric Co. In this transaction, the Lynn Gas Co. acquired -2- the gas portion of the Lynn Gas and Electric Co. Lynn Gas and Electric Co. kept the electric portion and changed its name to Lynn Electric Co. Lynn Gas Co. became part of NEES' gas division. In 1962, Lynn Electric merged into the Massachusetts Electric Company ("Mass. Electric"), a subsidiary of NEES and also an appellant in this case. In the 1959 Separation Agreement, Lynn Gas agreed to assume "all the duties and liabilities of Lynn Gas and Electric related to such gas business." The Agreement spelled out those duties and liabilities, but did not mention environmental or other contingent liabilities. Nonetheless, Lynn Gas Co. agreed to "indemnify and save harmless Lynn Electric Company from any duty or liability with respect to the gas business." The separation of the Lynn Gas Co. from Mass. Electric was not truly completed by the Agreement. Mass. Electric conveyed much of the gas-related real estate to Lynn Gas in 1962, more than two years after the separation occurred, and continued conveying gas- related parcels of land to Lynn Gas until 1970. Mass. Electric never transferred other parcels. In 1964 the SEC ordered NEES to divest itself of its gas holdings under the Public Utilities Holding Company Act, 15 U.S.C. 79a et seq. The Supreme Court affirmed. SEC v. New _______ ___ ___ England Electric System, 390 U.S. 207 (1968). NEES finalized the _______________________ divestiture in 1973 by selling Lynn Gas and several other gas companies to Boston Gas, a company unaffiliated with NEES. In the Purchase Agreement, Boston Gas agreed to assume the -3- liabilities of Lynn Gas "as then existing." A similar clause in the later document entitled Assumption of Liabilities provided that Boston Gas would assume all liabilities "outstanding at the date hereof." The Lynn Gas Co. was dissolved in 1980. Some of the land upon which the Lynn Gas & Electric Co. and Lynn Gas Co. manufactured gas was taken by eminent domain from Boston Gas and Mass. Electric in 1981 and sold to outside buyers. When these buyers discovered that the property was contaminated by coal gas waste, they sued NEES, NEES subsidiaries, and Boston Gas under CERCLA and its Massachusetts parallel.1 During the course of the suit, Boston Gas filed a claim against NEES because oil gas waste, generated after 1951, contaminated property it acquired in the Lynn Gas Co. deal. The case proceeded in two phases. The first phase resulted in a partial consent decree holding the utilities jointly and severally liable to plaintiffs for the cleanup. The second phase concerned liability among the utilities, and is the subject of this appeal. In the second phase, the court assigned full liability to Mass. Electric, as the successor of the Lynn Gas and Electric Co., for the cleanup of coal gas waste on plaintiffs' property. The court also ordered NEES and its subsidiary New England Power Service Co. ("NEPSCO")2 to pay for ____________________ 1 Plaintiffs also raised other claims, but their disposition is not at issue on appeal. 2 NEPSCO is a service company devoted to providing administrative, engineering, and other services to NEES companies. -4- the cleanup of oil gas waste on Boston Gas' property. This appeal followed. -5- DISCUSSION DISCUSSION __________ Under CERCLA3, four parties may be responsible for the costs of an environmental cleanup. These are: the owner or operator of a contaminated vessel or facility; the owner and operator of a facility at the time it became contaminated; any person who arranges for the transport or disposal of hazardous wastes; and any person who accepts hazardous wastes for the purposes of transport or disposal. 42 U.S.C. 9607(a). Courts have interpreted this statute to include successor corporations in a merger situation, e.g., Anspec Co. v. Johnson Controls, ____ __________ __________________ Inc., 922 F.2d 1240, 1245 (6th Cir. 1991); Louisiana-Pacific ____ _________________ Corp. v. Asarco, Inc., 909 F.2d 1260, 1262-63 (9th Cir. 1990), _____ ____________ and parent corporations when the parent can be considered an operator, United States v. Kayser-Roth Corp., 910 F.2d 24, 26 _____________ _________________ (1st Cir. 1990), cert. denied, 111 S. Ct. 957 (1991), or an _____________ owner, United States v. Kayser-Roth Corp., 724 F. Supp. 15, 23 _____________ __________________ ____________________ 3 Although we primarily discuss CERCLA in the body of the opinion, we have not overlooked the fact that the Massachusetts Superfund Act is also a part of this case. CERCLA "is in many ways analogous to the Massachusetts statute." Acme Laundry Co. _________________ v. Secretary of Environmental Affairs, 410 Mass. 760, 575 N.E.2d __________________________________ 1086, 1092 (1991); see also Dedham Water Co. v. Cumberland Farms ________ ________________ ________________ Dairy, Inc., 889 F.2d 1146, 1156 (1st Cir. 1989) (Massachusetts ____________ statute "is patterned after the federal CERCLA statute"). As such, the Massachusetts courts construe it in line with the Federal decisions "absent compelling reasons to the contrary or significant differences in content." Rollins Environmental ______________________ Services, Inc. v. Superior Court, 368 Mass. 174, 330 N.E.2d 814, _______________ ______________ 818 (1975) (discussing rules of procedure). Of course, the Massachusetts statute differs from CERCLA in some respects. See ___ Griffith v. New England Telephone & Telegraph Co., 414 Mass. 824, ________ _____________________________________ 610 N.E.2d 944 (1993) (defining owner and operator differently for the purposes of strict liability). We will not discuss Massachusetts law unless it becomes relevant to the case. -6- (D. R.I. 1989). The list of responsible parties reflects CERCLA's "essential purpose" of making "those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 ________________ ____________________________ F.2d 1074, 1081 (1st Cir. 1986).4 CERCLA thus makes such parties liable to the government or to other private parties for the costs of a cleanup. Id. ___ If 9607(a) imposes liability on a party, then that party cannot escape liability by means of a contract with another party. 42 U.S.C. 9607(e)(1) provides that "[n]o . . . agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section." That is, the government or a private party can pursue any responsible party it desires. Two or more parties, however, can allocate ultimate responsibility among themselves by contract. The same statute states that "[n]othing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement ____________________ 4 In Dedham Water, we recognized one other fundamental policy of ____________ CERCLA: "Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal." 805 F.2d at 1081. That policy is not implicated in this appeal. -7- for any liability under this section." Id. Such agreements have ___ been described as "tangential" to the enforcement of CERCLA. Jones-Hamilton Co. v. Beazer Materials and Services, Inc., 973 __________________ _____________________________________ F.2d 688, 692 (9th Cir. 1992). Appellants contend that the district court erred in imposing the full cost of cleanup in this case on them because, as companies separate from the Lynn Gas and Electric Co. or the Lynn Gas Co., they are not responsible parties under CERCLA. Rather, the district court should have imposed the full cost of cleanup on appellee Boston Gas. Appellants arrive at this conclusion in two steps. First, they argue that the Lynn Gas Co. is the direct successor to the gas portion of the Lynn Gas and Electric Co., and assumed its coal gas liability. Next, appellants argue that Boston Gas, as the successor of the Lynn Gas Co., assumed its coal and oil gas liabilities. We disagree with appellant on all points. I. I. We first discuss who is responsible for the coal gas waste created before any of the present parties were involved with the Lynn Gas and Electric Co. To accept appellant's conclusion, we must find that the liability shifted from the independent Lynn Gas and Electric Co., to the NEES-owned Lynn Gas and Electric Co. (renamed the Lynn Electric Co.), to the Lynn Gas Co., and finally to Boston Gas. We cannot do so, as the district court correctly found that the chain of liability for coal gas waste broke at the link between NEES and the Lynn Gas Co. -8- When NEES bought Lynn Gas and Electric Co., it maintained that company as a separate entity with continuing liability under CERCLA for the waste it created before 1951. See ___ 42 U.S.C. 9607(a)(1) (owner and operator of a vessel or facility is a responsible party). When NEES sold the gas portion of Lynn Gas and Electric Co. to the newly-created Lynn Gas Co., the environmental liabilities of Lynn Gas and Electric did not disappear. Consistent with CERCLA's policy of holding the company that sullied the property responsible for the costs of cleanup, see Dedham Water, supra, those liabilities travelled to the ___ _____________ _____ successor, if any, of Lynn Gas and Electric. See 42 U.S.C. ___ 9607(a)(2) (owner or operator of facility at time of discharge is a responsible party); Smith Land & Improvement Corp. v. Celotex _______________________________ _______ Corp., 851 F.2d 86, 91 (3d Cir. 1988), cert. denied, 488 U.S. _____ ____________ 1029 (1989). Initially, Lynn Gas and Electric Co. and Lynn Electric Co. were the same entities. That fact is reflected not merely because of a simple name change, but also because the Lynn Electric Co. kept Lynn Gas and Electric's property. As noted above, the Lynn Electric Co., which by then merged into Mass. Electric, conveyed the gas-related property to the Lynn Gas Co. at various points between 1962 and 1970. By virtue of the merger, Mass. Electric became the heir to the assets and liabilities of the Lynn Electric Co. See Smith Land, 851 F.2d at ___ __________ 91 ("In case of merger . . . where one corporation ceases to -9- exist and the other corporation continues in existence, the latter corporation is liable for the debts, contracts and torts of the former"). The question, then, is whether the Lynn Gas and Electric Co. transferred to the Lynn Gas Co. ultimate responsibility for environmental hazards by contract. The relevant document is the Separation Agreement (the "Agreement") entered into between the parties on September 9, 1959; a later indenture also bears on the issue. As neither document apportions CERCLA liabilities explicitly, we must discern the intent of the parties. We do this by reference to other cases dealing with nonexplicit assumptions of liability in order to set a standard by which to measure that intent. We note at the outset that the district court was uncertain whether to use a state rule of contract interpretation or a uniform federal rule. Indeed, while federal law governs the validity of liability agreements in the CERCLA context, Mardan ______ Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1457 (9th Cir. 1986), _____ __________________ courts have wrestled with what the content of that law should be. The majority of courts have turned to state contract law to provide the substantive rule, so long as it is not hostile to the federal interests animating CERCLA. E.g., id.; United States v. ____ ___ _____________ Hardage, 985 F.2d 1427, 1433 (10th Cir. 1993); Jones-Hamilton Co. _______ __________________ v. Beazer Materials & Services, Inc., 973 F.2d 688, 692-93 (9th __________________________________ Cir. 1992); Olin Corp. v. Consolidated Aluminum Corp, 807 F. __________ ___________________________ Supp. 1133, 1141 (S.D.N.Y. 1992); Rodenbeck v. Marathon Petroleum _________ __________________ -10- Co., 742 F. Supp. 1448, 1456-57 (N.D. Ind. 1990). But see Mobay ___ _______ _____ Corp. v. Allied-Signal, Inc., 761 F. Supp. 345, 352 (D. N.J. _____ ____________________ 1991); Wiegmann & Rose Int'l Corp. v. NL Industries, 735 F. Supp. ___________________________ _____________ 957, 961-62 (N.D. Cal. 1990). This circuit recently reached the same conclusion in an analogous situation. American Policyholders Insurance Co. v. ______________________________________ Nyacol Products, Inc., No. 92-1949, slip op. at 16 (1st Cir. ______________________ Feb. 24, 1993) (rejecting use of "uniform federal rule of decision to govern interpretation of an insurance policy's scope of coverage vis-a-vis CERCLA liability"); see also Robertshaw _________ __________ Controls Co. v. Watts Regulator Co., 807 F. Supp. 144, 153 (D. ____________ ___________________ Me. 1992) (applying state rather than federal law to interpret whether settlement agreement shifted CERCLA liability). We thus look to Massachusetts law for guidance in interpreting the Agreement with respect to CERCLA liabilities. Two principles strike us as particularly relevant. First, "laws enacted after the execution of an agreement are not commonly considered to become part of the agreement unless its provisions clearly establish that the parties intended to incorporate subsequent enactments into their agreement." Arthur D. Little, _________________ Inc. v. Commissioner of Health and Hospitals, 395 Mass. 535, 481 ____ ____________________________________ N.E.2d 441, 452 n.13 (1985) (quoting Feakes v. Bozycako, 373 ______ ________ Mass. 633, 369 N.E.2d 978, 980 (1977)); see also Mayor of Salem _________ ______________ v. Warner-Amex Cable Communications, Inc., 392 Mass. 663, 467 _______________________________________ N.E.2d 208, 210 (1984). Second, "a general release . . . is to be given effect, even if the parties did not have in mind all the -11- wrongs which existed at the time of the release," so long as the language of that release is broad enough to encompass such contingent liability. Naukeag Inn, Inc. v. Rideout, 351 Mass. __________________ _______ 353, 220 N.E.2d 916, 918 (1966). These principles essentially lead to one rule applicable to the present case. To transfer CERCLA liability, the Agreement must contain language broad enough to allow us to say that the parties intended to transfer either contingent, environmental liability, or all liability. The Agreement must recognize the possibility of future liability or dispense Lynn Gas and Electric of all liabilities in the form of a general release. Unfortunately for appellants, the language of the Agreement is not drafted in such broad terms. While initially the Agreement provides that "Lynn Gas will assume and take over all the duties and liabilities" related to the gas business, the Agreement later lists those obligations. The series contains obligations pertaining only to the existing business, such as obligations to serve gas customers, honor contracts for the purchase and sale of new facilities, and provide reserves to account for bad debt and depreciation on the gas plant. No reference is made to any future or contingent liabilities. An indenture entered into by the parties several months later contains a similar list. A catch-all provision on liability refers to the liabilities "indicated in summary form by the balance sheet" attached to the document, revealing an intent -12- that the only liabilities assumed were those known, existing, and somehow accounted for at the time of execution. It is true that the indenture states that the liabilities specifically assumed by Lynn Gas are "without implied limitation." But it is one thing to say that the list of liabilities is not all-inclusive and quite another to assume that the obligations not specified include then non-existent environmental liabilities to be created under CERCLA and unforeseeable when the agreement was made. We must conclude that neither document evidences the intent to transfer environmental liability in the requisite broad language. The responsible party in this case, as between Mass. Electric and Boston Gas, is Mass. Electric -- the successor to the Lynn Gas and Electric Co. See ante at 7-8. ___ ____ II. II. We now discuss who is responsible for the oil gas waste contaminating the property owned by Boston Gas. To find for appellants, we must determine that Boston Gas agreed to assume the environmental liabilities of the oil gas waste produced by Lynn Gas Co. between 1951 and 1970. Happily, the contract principles that steered our analysis on the issue of coal gas waste steer most of our analysis on this issue also. We must determine whether Boston Gas agreed to assume environmental liabilities in its agreement to buy Lynn Gas Co.5 ____________________ 5 Technically, NEES sold the Lynn Gas Co. first to Eastern Gas and Fuel Associates, the parent company of Boston Gas. Eastern then sold Lynn Gas to Boston Gas on the same day. Because this intermediate transaction does not alter any liability in this case by statute, contract, or any other norm, we discuss Eastern -13- The contract governing the sale of Lynn Gas to Boston Gas, the Closing Agreement, provides an easier case than did the Agreement discussed above. The Closing Agreement expressly limited the liabilities assumed by Boston Gas to those "as then existing." A similar clause in the Assumption of Liabilities document provided that Boston Gas would assume only those liabilities "outstanding at the date hereof." Such language fairly obviously forecloses the possibility that Boston Gas agreed to assume any contingent liabilities, much less the environmental liabilities at issue here. Nothing in the remaining documents changes this conclusion. Apart from the language of the contract, the district court found several other facts convincing in finding that Boston Gas lacked the intent to assume the liability here at issue. For example, the parties did not discuss oil gas waste in their negotiations. Indeed, it does not appear that Boston Gas was informed about the oil gas waste at all. Furthermore, there was no communication between the parties about any contingent liabilities not appearing on the balance sheet. These facts bolster our confidence in concluding that Boston Gas did not accept those liabilities. Although we are convinced that Boston Gas cannot be held liable for the oil gas waste, we must determine whether the district court was correct to impose those liabilities on NEES and NEPSCO. In other words, are NEES and NEPSCO responsible ____________________ no further. -14- parties? In Kayser-Roth, 910 F.2d at 26, we determined that ___________ parent companies can be held liable for CERCLA liability as operators of a contaminated facility under 42 U.S.C. 9607(a)(2).6 Such liability is direct; it does not require us to pierce the corporate veil. Id. at 27 ("Kayser is being held ___ liable for its activities as an operator, not the activities of a ___ subsidiary"). In contrast, piercing the corporate veil is a form of owner liability. Kayser Roth, 724 F. Supp. at 23. The ____________ district court determined that Kayser was liable both as an operator and an owner. Id. at 22-24. When the case came before ___ our court, we left open the question of owner liability because our finding on operator liability resolved the issues satisfactorily. 910 F.2d at 28 n.11. We envisioned in Kayser that holding a parent liable as ______ an operator would be somewhat unusual. Id. at 27. "To be an ___ operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary." Id. This standard requires ___ an investigation into the relationship between the parent and subsidiary, in order to reveal the requisite level of corporate involvement. As the question is fact-laden, we review the district court's findings only for clear error. Id. ___ ____________________ 6 That section holds liable "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." -15- The relationship among the relevant companies in this case amply demonstrates that operator liability burdens NEES and NEPSCO with the responsibility to purge the oil gas waste from Boston Gas' property. We recite only a few of the facts which the district court found dispositive, and which we too find important. NEES continually maintained a presence among the officers and directors of Lynn Gas. The president of Lynn Gas was also the president of NEES' gas division; he was appointed by the chairman of NEES and reported directly to NEES officials. NEES selected the directors of Lynn Gas, and a senior officer of NEES approved Lynn Gas' budget. Lynn Gas needed approval for all expenditures over $5,000. NEPSCO provided extensive services to Lynn Gas, such as controlling the checking account, handling the purchase of the oil used in peak shaving, and maintaining Lynn Gas property. NEPSCO employees were also well represented among Lynn's officers and directors. Given the almost overwhelming evidence, we cannot say that the district court clearly erred in finding that NEES and NEPSCO were operators of the Lynn Gas facilities. NEES and NEPSCO are responsible parties for the oil gas waste created while they were linked to the Lynn Gas Co. III. III. We must resolve several residual matters, but they need not detain us long. Appellants contend that under the principles of -16- successor liability, Boston Gas must be liable for the cleanup of the waste sites. Appellants' argument has initial appeal in that Boston Gas, and Lynn Gas before it, took over the gas business of other companies. This argument, however, does not reflect the successor corporation doctrine. In Dayton v. Peck, Stow and ______ _______________ Wilcox Co., 739 F.2d 690, 692 (1st Cir. 1984), we identified four __________ situations in which successor liability is appropriate: when the buyer agrees to assume liability; when a consolidation or de facto merger occurs; when the buyer is merely a continuation of the seller; and when the transaction is a fraud to escape liability. We have already determined that Boston Gas, and Lynn Gas before it, did not agree to assume environmental liability. Furthermore, there is no allegation of fraud in this case. Only the merger and continuation situations remain to bind Boston Gas as successor to the gas liabilities in this case. There was, of course, no formal merger by which Lynn Gas Co. -- and later Boston Gas -- assumed the liabilities of Lynn Gas and Electric Co., so appellants would have to prove a de facto merger claim. Central to a de facto merger or continuation of the seller corporation claim, however, is a finding that shareholders, officers and directors continued into the buyer corporation. Id. ___ at 693. Boston Gas, however, did not share any such continuity. The successor corporation doctrine actually supports imposing liability on appellants, as the requisite continuity existed in their corporate structures. -17- Appellants also argue that Mass. Gen. L. ch. 164 98 requires the assumption by Boston Gas of the environmental liabilities at issue here. That brief statute states that "[t]he purchasing or consolidated company shall . . . be subject to all the duties, liabilities and restrictions, of the company selling or merged as aforesaid, so far as they are applicable to the purchasing or consolidated company." The district court found that the statute simply serves to allocate the rights of the public with respect to the utilities, and does not curtail the rights of contracting parties to allocate ultimate liability between themselves. We find no error in the district court's interpretation of 98. The documents transferring the gas business to Lynn Gas Co. and later selling Lynn Gas Co. to Boston Gas both refer to 98. The documents proceed to list the present liabilities owed by the companies to customers and other members of the public. The parties thus understood the statute to allocate certain, existing liabilities only. The liabilities at issue in this case are not among them. Finally, appellants argue that equity requires Boston Gas to share in the cost of the cleanup. We find nothing inequitable in imposing those costs solely on appellants, however. The policy underlying CERCLA -- to make those who befouled the environment responsible for its cleanup -- is certainly equitable. See Dedham Water, 805 F.2d at 1081. We ___ ____________ have found that appellants were the proper responsible parties in -18- this case, and it is equitable for them to clean up the property. Affirmed. ________ -19-