In re BABCOCK & WILCOX
COMPANY, Debtors.

Diamond Power International, Inc.,
Babcock & Wilcox Construction
Co., Inc. and Americon, Inc.

Nos. 00–10992 to 00–10994.

United States Bankruptcy Court,
E.D. Louisiana.

April 8, 2009.

Greta M. Brouphy, Heller, Draper, Hayden, Patrick & Horn, New Orleans, LA, Jan Marie Hayden, Joy Lyu Monahan, Linda Anne Faucheux, New Orleans, LA, Tristan E. Manthey, Warren Horn, William H. Patrick, III, Heller Draper Hayden Patrick & Horn, New Orleans, LA, for The Babcock & Wilcox Co.

Jan Marie Hayden, Joy Lyu Monahan, New Orleans, LA, William H. Patrick, III, Heller Draper Hayden Patrick & Horn, New Orleans, LA, for Diamond Power Intern., Inc., Babcock & Wilcox Constr. Co., Inc.

Jan Marie Hayden, New Orleans, LA, for Americon, Inc., Babcock & Wilcox Co.

Robert C. Gravolet, New Orleans, LA, for Office of the U.S. Trustee.

William E. Steffes, Steffes Vingiello & McKenzie, LLC, Baton Rouge, LA, for Unsecured Creditors' Committee.

## MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

This matter came on for hearing on August 25, 2008 on the objection of the debtor, Babcock & Wilcox Company ("B & W") to Claim No. 33 filed by PMAC, Ltd. ("PMAC"). For the reasons set forth below, PMAC's claim is limited to $147,203.99, which represents the costs PMAC proved were necessary to clean up the forty-eight Solid Waste Management Units ("SWMUs") and three Areas of Concern ("AOCs") identified during the United States Environmental Protection Agency's ("EPA") initial assessment of the property.[1]

### I. Procedural Posture

On February 22, 2000, B & W, Diamond Power International, Babcock and Wilcox Construction Co., Inc., and Americon, Inc. each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.[2] Approximately two years before these filings, PMAC had filed a complaint against B & W in the United States District Court of the Western District of Pennsylvania ("the Pennsylvania litigation") seeking to hold B & W responsible for the costs necessary to clean up a facility that B & W had sold to PMAC. In response, B & W filed in the same federal district court in Pennsylvania a complaint for declaratory judgment seeking judg-

---

**1.** As proved by the invoices PMAC attached to its proof of claim.

**2.** 11 U.S.C. §§ 101, *et seq.*

ment that, according to the parties' Purchase and Sale Agreement ("PSA"), B & W was not responsible for the cleanup costs.[3] The parties stipulated to dismiss PMAC's action without prejudice and the case proceeded in Pennsylvania in the declaratory judgment suit. After significant discovery, B & W and PMAC filed cross motions of summary judgment seeking a ruling interpreting the PSA. The Magistrate Judge recommended denial of the cross motions for summary judgment.

As a result of the current bankruptcy proceedings, B & W filed a notice of automatic stay in the Pennsylvania litigation. On April 18, 2000, PMAC filed a proof of claim in this court seeking $1,305,299.55 from the debtor's estate as the cost of the cleanup.[4] On July 18, 2003, B & W filed an objection denying liability for PMAC's claim.[5]

During a July 11, 2008 status conference, B & W and PMAC advised this court that they would submit the contract interpretation issue solely on their briefs and oral arguments.[6] In response, in lieu of a two and a half day trial, the court scheduled oral arguments and ordered B & W and PMAC to submit a joint stipulation of facts and updated briefs.[7]

At the August 25, 2008 oral arguments, PMAC stated that it thought the purpose of the oral arguments was to argue for summary judgment. The court responded that it did not intend to entertain a summary judgment, but instead was going to decide the claim on the merits. The court noted that neither party had filed a motion for summary judgment with the bankruptcy court. Additionally, the court directed the parties' attention to the July 15 order which ordered the parties to submit a joint stipulation of facts and scheduled oral arguments in lieu of a two and a half day trial, but did not specifically mention summary judgment. After the oral arguments, the court informed B & W and PMAC that it would take counsels' arguments, the joint stipulation of facts, and their briefs[8] under advisement. The court has done so and now enters a final judgment on the merits.

## II. *Background Facts.*

PMAC's claim arises out of the January 15, 1990 PSA, as amended, between PMAC and B & W wherein B & W agreed to sell PMAC certain assets of B & W's former tubular products division. The assets included a facility located in Koppel, Pennsylvania (the "Koppel Plant"). The Koppel Plant was a steel making site that used electric arc furnaces to melt steel to produce carbon and alloy steel. This process produced hazardous electric arc furnace dust ("EAF dust") as a byproduct. B & W and PMAC recognized the environmental liabilities at the Koppel Plant and allocated

---

3. P–7745, Ex. B. B & W and PMAC did not submit the majority of documents electronically because of the voluminous amount of material filed in the Eastern District of Pennsylvania. Instead, the court will refer to the exhibits attached to the Joint Stipulation of Facts (P–7745), B & W's memorandum (P–7746), and PMAC's memorandum (P–7744) as they are labeled by the parties.

4. P–7745, Ex. E.

5. P–4394.

6. The parties stipulated that, in this action, they would use the depositions and documents produced in the Pennsylvania litigation to the same extent as if they took the depositions and produced the documents in this action, subject to any and all objections raised by either party.

7. P–7741.

8. This includes any previous briefs, memoranda or exhibits from the Pennsylvania litigation incorporated by reference.

those liabilities in various provisions of the PSA. The allocation resulted in PMAC assuming significantly more liability than it otherwise would have incurred, which PMAC was willing to do in exchange for a low purchase price of $50 million.

In the court's mind, one of the more important provisions of the PSA is Article IV, in which B & W agrees to sell and PMAC agrees to buy all assets on an "as is, where is, with all faults" basis.[9] The language in Article IV sets the general tenor of the transaction. Other provisions furnish details.

Sections 3.03 and 3.04 of the PSA outline PMAC's assumed and excluded liabilities in more detail. PMAC's assumed liabilities include, with few limitations, all liabilities arising out of or relating to the discharge, emission or release of pollutants or the generation, treatment, storage or disposal of any wastes by B & W at or on the property prior to closing.[10] But, one of the few limitations is that PMAC is not liable for any cleanup relating to the EAF Dust Pile.[11]

Article VI, Sections 6.08(a) and (b) of the PSA expressly provide for the allocation of pre- and post-closing environmental liabilities at the Koppel Plant.[12] Section 6.08(a) requires PMAC to conduct an environmental audit and provide B & W with the written results of the audit, including "all actions with respect to cleanup or remediation of existing problems" (i.e., conditions requiring remedial actions under laws and regulations in effect as of the agreement date).[13] Under 6.08(a), the actions identified in PMAC's audit, as modified by B & W's consultant, became the "Identified Actions." B & W then had the opportunity to name any of the Identified Actions for which it was unwilling to be liable. At that point, PMAC had the right either to (1) terminate the transaction with no further obligations, or (2) proceed with the transaction and assume the liability for any items for which B & W had refused to be liable.[14]

Section 6.08(b) addresses liability for any environmental problems that existed prior to closing, but were not discovered until after closing. If the problem is discovered more than five years after closing, then PMAC bears 100% of the costs associated with remediation. If the problem is discovered within five years of closing, B & W bears the initial $250,000.00. If the remediation costs exceed $250,000.00, then B & W bears 66% (2/3) and PMAC bears 33% (1/3) of the remaining costs. According to the agreement, B & W's total liability could not exceed thirty million dollars.[15]

Article X, Section 10.05 limits the liability of an indemnifying party and the remedy of an indemnified party to that exclusively provided for in the PSA.

Based on the provisions outlined in the PSA, B & W agreed to obtain appropriate cleanup permits for the EAF waste pile and landfill, then close the waste pile and landfill and conduct post-closure monitoring activities at the landfill.[16] B & W applied for a Resource Conservation and Recovery Act ("RCRA") Part B hazardous waste permit with the Pennsylvania Department of Environmental Protection

9.  PSA, Article IV (P–7745, Ex. A).

10.  PSA, § 3.03 (P–7745, Ex. A).

11.  P–7745 at ¶ 22.

12.  P–7745 at ¶ 25.

13.  PSA, § 6.08(a)-(b) (P–7745, Ex. A).

14.  P–7745 at ¶ 25.

15.  P–7745 at ¶ 25.

16.  P–7745 at ¶ 23.

("PA DEP") and the United States Environmental Protection Agency ("EPA"). The permit would authorize B & W to remove all EAF dust from the waste pile in accordance with Section 3.04.

PMAC hired a consulting firm, Burgess & Niple, Ltd. ("Burgess"), to perform prior to closing the environmental audit of the property required by Section 6.08(a). After Burgess completed the audit, it issued PMAC a report dated February 28, 1990 which identified seventy-eight environmental issues present at the Koppel Plant ("the February 28 report").[17] For unexplained reasons, PMAC did not provide B & W with a copy of the February 28 report.[18] Instead, PMAC issued B & W a report on March 15, 1990 which identified six specific environmental issues that required remediation (the "March 15 report").[19] On April 10, 1990 B & W and PMAC met and agreed that B & W would give PMAC a $1.8 million credit towards the ultimate purchase price in exchange for PMAC's assumption of liability for the six issues the March 15 report identified.[20]

B & W requested from the EPA a RCRA Part B Permit. The EPA contracted with A.T. Kearney, Inc. ("Kearney") to conduct a visual site inspection at the Koppel Plant.[21] After Kearney conducted its inspection, it issued a report to the EPA on June 7, 1990 ("Kearney Site Report") which detailed the results of the site inspection and identified forty-eight SWMUs and three AOCs.[22]

On June 25, 1990, before either party had access to the Kearney Site Report, B & W and PMAC negotiated the First Amendment to the PSA. Paragraph 2 of the First Amendment serves as a "Resolution of Environmental Matters."[23] Paragraphs 2(a), 2(c), and 2(e) address certain liabilities identified in the March 15 report including tank containment, soil containment, soil remediation, and contamination from a waste pickle spill. Paragraph 2(b) limits B & W's liability based on the contents of the Kearney Site Report and the cleanup required by the EPA as a condition to the RCRA Part B permit.

As part of the October 4, 1990 closing, B & W and PMAC agreed on the $50 million purchase price which included the discount based on the liabilities B & W agreed to assume in Paragraph 2. Additionally, B & W and PMAC executed a Second Amendment to the PSA such that when the deal

17. P–7745 at ¶ 28.

18. P–7745 at ¶ 28. In fact, PMAC never furnished B & W with the entire report. Ultimately, B & W received the February 28 report from Burgess, who relinquished it in response to an independent subpoena. P–7746 at p. 6.

19. P–7745 at ¶ 29.

20. P–7745 at ¶ 31.

21. Before the EPA issues a RCRA Part B permit, it organizes a visual site inspection and identifies existing SWMUs and AOCs on site. SWMUs, or Solid Waste Management Units, are discernable units such as landfills, waste piles, and tanks at which solid wastes requiring cleanup under RCRA have been placed. Corrective Action for Releases From Solid Waste Management Units at Hazardous Waste Management Facilities, 61 Fed.Reg. 19432 (proposed May 1, 1996) (to be codified at 40 C.F.R. Ch. I). AOCs, or Areas of Concern, generally refer to waste releases that warrant investigation. Corrective Action for Releases From Solid Waste Management Units at Hazardous Waste Management Facilities, 61 Fed.Reg. 19443 (proposed May 1, 1996) (to be codified at 40 C.F.R. Ch. I). The EPA often requires as a condition to the permit that the applicant clean up these identified SWMUs and investigate the identified AOCs, even if they are unrelated to the area requiring the permit.

22. P–7745 at ¶ 33.

23. P–7745 at ¶ 34.

closed, PMAC concurrently assigned its rights to the Koppel Plant to Koppel Steel Corporation ("KSC") for $94.9 million.[24]

After the closing, the EPA sent Burgess a memo that explained that it planned to issue B & W a draft RCRA Part B permit by January 1, 1991 and asked Burgess to suggest SWMUs and AOCs that Burgess wanted the EPA to consider assigning B & W as conditions for the permit.[25] On November 26, 1990 Burgess drafted a letter for PMAC to submit to the EPA. But, at PMAC's request, KSC submitted the final draft of the Burgess letter to the EPA on December 6, 1990 ("the KSC letter").[26] The KSC letter acknowledged the forty-eight SWMUs and three AOCs listed in the Kearney Site Report. Additionally, it identified thirty-four areas (the "KPs") that Kearney did not include in the Kearney Site Report. KSC requested that the EPA "review each of these locations and include them in the [facility assessment] and, if necessary, in the [facility investigation] to be completed at the Koppel facility."

On April 5, 1991 and on September 30, 1991, the PA DEP and the EPA each issued its respective permit to B & W. The EPA did not condition the permit on any tasks except those directly associated with the EAF dust waste pile and landfill, although it reserved its right to modify the permit conditions if necessary.[27]

A few years later, on February 26, 1993, the EPA sent an inquiry to KSC that requested information about potential environmental issues at the Koppel Plant.[28] On September 6, 1994, the EPA issued a draft Consent Order to KSC requiring KSC to perform a facility investigation to determine the extent of the release of hazardous wastes and hazardous constituents into the environment at the Koppel Plant. KSC notified PMAC and B & W of the draft Consent Order. PMAC agreed to fund the costs of compliance of the Consent Order because of PMAC's and KSC's agreement to assign interest in the PSA.[29] On March 14, 1995, EPA issued its final Consent Order.[30] PMAC bore all the costs of remediation associated with these conditions.

As noted, PMAC ultimately filed a proof of claim in this court seeking $1,305,299.55 from B & W in connection with the Consent Order cleanup costs. For the reasons stated below, PMAC's claim is limited to $147,203.99, which represents the costs PMAC proved as necessary to clean up the forty-eight SWMUs and three AOCs identified in the Kearney Site Report.

### III. Legal Analysis

B & W's objection to PMAC's claim that B & W is liable for the Consent Order cleanup costs rests on three theories.

---

24. P–7745 at ¶ 41. As part of the PMAC–KSC transaction, PMAC agreed to indemnify KSC for environmental liabilities related to the Koppel Plant. Not surprisingly, PMAC's indemnification to KSC is much broader than that of B & W to PMAC. After all, PMAC made a turn around profit of $44.9 million by a sale to KSC of only a portion of the property acquired from B & W.

25. P–7745, Ex. I.

26. P–7745 at ¶ 45.

27. P–7745 at ¶ 47. Nevertheless, the EPA has not sought to amend the original permit to include additional permit conditions or to require B & W to conduct remediation at any additional SWMUs at the Koppel Plant. The parties' briefs do not allege that the PA DER conditioned its permit on any type of cleanup.

28. The EPA cited the KSC letter as the source of its inquiry. P–7746, Ex. X.

29. P–7745 at ¶ 54.

30. P–7745 at ¶ 58.

First, B & W argues that Paragraph 2(b) of the First Amendment of the PSA limits B & W's liability so that it is not responsible for any Consent Order costs. Second, B & W asserts that PSA Section 6.08(b) holds PMAC responsible for damages associated with environmental issues that it discovered before closing. Third, B & W argues that the contract preempts PMAC's Federal and Pennsylvania Statutory law and common law tort claims.

## A. Paragraph 2(b) of the First Amendment

The central dispute between the parties concerns the interpretation of Paragraph 2(b) of the First Amendment to the PSA. B & W argues that the language of Paragraph 2(b) limits its liability, whereas PMAC argues that it does not. Although their interpretations of Paragraph 2(b) differ, each argues that it is unambiguous. The court concludes that Paragraph 2(b) limits PMAC's claim to $147,203.99, which represents the costs PMAC proved were necessary to clean up the forty-eight SWMUs and three AOCs identified in the Kearney Site Report.

▆▆▆ The parties agree that this court should interpret and construe the PSA in accordance with Pennsylvania law.[31] Under Pennsylvania law, in order to interpret a contract, the court must determine the intent of the parties and give effect to all provisions in the contract.[32] Whether a

contract is clear and unambiguous is a question of law.[33] If a contract is reasonably susceptible to different constructions and is capable of being understood in more sense than one, then it is ambiguous.[34] But, a contract is not ambiguous just because the parties do not agree on the proper construction.[35]

▆▆▆ Ideally, if a single reasonable meaning is evident from the face of the language, the court's interpretive inquiry is at an end.[36] But, the court can extend the inquiry beyond the face of the language to determine the meaning with knowledge of facts on which the meaning depends.[37] Whether the language of an agreement is unambiguous may not be apparent without examining the context in which the agreement arose.[38] Thus, the court is not always confined to the four corners of the written document and it may consider words of agreement, suggested alternative meanings, and the nature of objective evidence in support of those meanings.[39]

▆▆▆ Paragraph 2(b) reads, in part:

[B & W] agrees to promptly and diligently undertake, whether before or after the Closing, all remedial actions necessary to clean up any [SWMU or AOC] identified by the EPA and/or PA DER as a result of the April, 1990 EPA and PA DER site assessment of the Koppel

31. PSA, § 12.07 ("THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA....") (P–7745, Ex. A).

32. *Com., Dept. of Transp. v. Manor Mines, Inc.*, 523 Pa. 112, 565 A.2d 428, 432 (1989).

33. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 n. 10 (3d Cir.1980).

34. *Id.* at 1011.

35. *Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638, 642–43 (1993).

36. *See Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982).

37. *Krizovensky*, 624 A.2d at 642.

38. *McChesney*, 444 A.2d at 662.

39. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir.1994).

Plant and any other follow-up assessment or investigation related to the April, 1990 site assessment in connection with the RCRA Part B Closure of the Koppel Landfill and any [AOC] identified, provided such actions are based on conditions in existence at the Koppel Plant at or prior to [closing]. . . . [40]

B & W and PMAC dispute the meaning of two portions of Paragraph 2(b). First, they argue whether B & W's liability is limited to the EPA's conditions for issuing the RCRA Part B permit. Second, they dispute the meaning of "remedial actions" as used in Paragraph 2(b). For the reasons set forth below, this court concludes that *(1)* Paragraph 2(b) limits B & W's liability to the SWMUs and AOCs identified by the EPA in the Kearney Site Report, *(2)* "remedial actions" as used in Paragraph 2(b) are limited to clean up costs, and *(3)* B & W's liability under Paragraph 2(b) is limited to $147,203.99, which represents the costs PMAC proved were necessary to clean up the forty-eight SWMUs and three AOCs identified in the Kearney Site Report.

### 1. *B & W's Limited Liability*

B & W and PMAC dispute the degree that the language of Paragraph 2(b) limits B & W's liability for the Consent Order costs. B & W argues that the first sentence only holds B & W liable for the EPA's and PA DER's conditions for the RCRA Part B permit. PMAC argues that the first sentence holds B & W liable for all Consent Order costs.

Although B & W's and PMAC's interpretations of Paragraph 2(b) differ, there is only one construction that gives effect to all the provisions of the paragraph. The court finds that based on a plain reading of Paragraph 2(b), B & W agreed to undertake all remedial actions necessary to clean up any SWMU or AOC identified by the EPA and/or PA DER, *(1)* in the Kearney Site Report, and *(2)* as a result of any other follow-up assessment or investigation related to *(A)* the Kearney Site Report, and *(B)* any AOC identified therein. Three factors support this conclusion. First, this interpretation is the only one that gives meaning to "and any [AOC] identified." Second, this interpretation reflects the "where as, as is" tenor of the transaction. Third, if the parties intended to for B & W to be liable for all conditions for the RCRA Part B permit, they could have drafted Paragraph 2(b) to clearly include that language.[41]

The Kearney Site Report identified forty-eight SWMUs and three AOCs. Based on the record, neither the EPA or the PA DER conducted follow-up assessments or investigations as a result of the Kearney Site Report that could have uncovered additional SWMUs and AOCs. Therefore, B & W is only liable for the costs of the remedial actions necessary to clean up the forty-eight SWMUs and three AOCs identified in the Kearney Site Report.[42]

---

**40.** The "April, 1990 EPA and PA DER site assessment of the Koppel Plant" appears to be the same assessment on which Kearney based the Kearney Site Report.

**41.** For example, "[B & W] agrees to . . . undertake . . . all remedial actions necessary to clean up any SWMU or AOC identified *as a condition to the RCRA Part B permit* by the EPA and/or PA DER resulting from. . . ."

**42.** B & W is not liable for the thirty-four areas submitted to the EPA by KSC (the "KPs") for

two reasons. First, the EPA could not have identified the KPs as problem areas identified in the Kearney Site Report because the EPA did not discover the KPs during its site assessment. Second, the EPA did not identify the KPs as problem areas during a follow-up assessment or investigation related to the Kearney Site Report. Rather, the EPA identified the KPs as problem areas after the Kearney Site Report was complete and after it and the PA DER issued B & W its RCRA Part B closure permits. Furthermore, when the EPA

## 2. Remedial Actions

B & W and PMAC dispute the definition of "remedial actions" as used in Paragraph 2(b). B & W argues that the costs of remedial actions are limited to clean up costs, whereas PMAC argues that the costs of remedial actions include the costs of excavation, treatment and disposal as well as the costs of investigation. The court finds that the costs of remedial actions are limited to cleanup costs.

The plain language of Paragraph 2(b), "[B & W] agrees to . . . undertake . . . all *remedial actions* necessary *to clean up* any [SWMU] identified by the EPA and/or the PA DER," (emphasis added) supports B & W's argument. The language places the emphasis on cleaning up; not on investigation. Moreover, when read in the context of Paragraph 2(b) as a whole, the remedial action for which B & W is responsible *results from* investigation and therefore does not include investigation.

Additionally, the court finds it significant that in its cash flow reports, PMAC divided the costs of the Consent Order work into two separate categories: investigation and remediation.[43] PMAC's own distinction suggests that the parties understood remedial action to be separate from investigation. Therefore, the court concludes that the only remedial actions for which B & W is responsible are the costs necessary to clean up the forty-eight SWMUs and three AOCs identified in the Kearney Site Report.

## 3. The $147,203.99 Proof of Claim Limit

The $147,203.99 figure is based on the five invoices PMAC attached as support

for its proof of claim. The invoices break down PMAC's expenses into "legal fees," "consent order negotiation," "description of current conditions," "preliminary investigation," "stabilization work plan," "RFI work plan investigation," "stabilization work plan implementation," "RFI work plan implementation," and "lab work for both RFI work plan investigation and stabilization work plan implementation." Of those expenses, B & W is only responsible for the cleanup costs identified under "stabilization work plan implementation," and "RFI work plan implementation." In most cases, these two categories include a description of the applicable SWMU, AOC or KP, the date, the invoice number, and the cost. But, in some cases, the description does not list a particular SWMU, AOC or KP, or it lists a mix of SWMUs, AOCs and KPs.

PMAC carries the burden of proving the amount of its proof of claim. The "stabilization work plan implementation" and "RFI work plan implementation" costs that PMAC did not explicitly attribute to one of the forty-eight SWMUs or three AOCs for which B & W is liable do not meet this burden. Therefore, PMAC's proof of claim is limited to $147,203.99— those costs which it proved were necessary to clean up the forty-eight SWMUs and three AOCs identified in the Kearney Site Report.

## B. Section 6.08(b)

■ B & W and PMAC dispute whether Section 6.08(b) holds B & W liable for the

---

contacted KSC about the draft Consent Order, it did not refer to the Kearney Site Report or an investigation occurring in connection with the RCRA Part B closure of the Koppel Plant. Instead, the EPA pointed to KSC's own letter as the catalyst for the EPA's inquiry. P–7745 at ¶ 51, n. 15.

**43.** *See* Hinze Dep. at 36 (P–7746, Ex. T); P–7745, Ex. E (where invoices attached to proof of claim are separated into investigation and implementation costs).

remedial actions identified in the Consent Order. B & W argues that it is not liable under Section 6.08(b) because Section 6.08(b) only applies to conditions discovered after closing and that all the actions identified in the Consent Order are conditions which PMAC discovered in the February 28 report before closing. PMAC argues that B & W is liable for all Consent Order actions which fell outside the Identified Actions. The court concludes: *(1)* PMAC received the February 28 report prior to closing; *(2)* when PMAC received the February 28 report it "discovered" all the environmental issues identified in the report, and *(3)* the February 28 Report included all the environmental issues in the Consent Order. Therefore, B & W is not liable for any Consent Order costs under Section 6.08(b).

Sections 6.08(a) and (b) collectively provide for the allocation of pre– and post-closing environmental liabilities at the Koppel Plant.[44] Section 6.08(a) allows B & W and PMAC to distribute liability for environmental conditions that existed and were known prior to closing. Section 6.08(b) limits B & W's post-closing liability to "problems existing at the Plant[ ] ... first discovered after [closing] and on or prior to the fifth anniversary of [closing]. ..." In accordance with Section 6.08(a), PMAC enlisted Burgess to conduct an environmental audit of the Koppel Plant. Burgess completed the audit and prior to closing, provided PMAC with a

report dated February 28, 1990 which identified seventy-eight environmental issues present at the Koppel Plant.[45] PMAC never provided B & W with a copy of the February 28 report.[46] Instead, PMAC issued to B & W a report on March 15, 1990 that identified only six environmental issues ("the March 15 report").[47] But, regardless of when PMAC issued B & W the limited report, it is clear that PMAC received the February 28 report prior to closing.

PMAC's argument that because B & W did not learn of the non-disclosed environmental issues until after closing that B & W is somehow liable for the costs and expenses of cleanup is ludicrous. PMAC ignores the fact that B & W failed to discover these environmental issues because PMAC omitted them from the March 15 report.[48] A plain reading of the PSA makes clear that Section 6.08 does not specify B & W's liability based on *who* discovers the environmental conditions. Instead, the Section 6.08 language bases B & W's liability on *when* the environmental conditions are discovered. Thus, when PMAC received the February 28 report, it "discovered" all the environmental conditions listed in it.

B & W asserts that the February 28 report notes all the Consent Order environmental conditions for which PMAC claims B & W is liable. PMAC has not argued or put forth evidence to dispute B & W's assertion. In support of its claim,

---

**44.** P–7745 at ¶ 25.

**45.** P–7745 at ¶ 28.

**46.** P–7745 at ¶ 28.

**47.** P–7745 at ¶ 29. In doing so, PMAC ignored Section 6.08(a)'s requirement that PMAC provide B & W with "a list of *all* actions with respect to clean-up or remediation of existing problems (i.e., conditions requiring remedial actions under laws and regulations in effect as of the Agreement Date)

... and which [PMAC] would require [B & W] to undertake to remediate on a mutually acceptable basis." (emphasis added).

**48.** Even as late as oral argument in this case on August 25, 2008, PMAC had no explanation as to why it did not furnish to B & W the February 28 report identifying seventy-eight environmental issues instead of the March 15 report with only six issues.

B & W points to, among other things, the thoroughness of Burgess's report, PMAC's identification of all the Consent Order conditions on the schedules to the PMAC–KSC agreement, and the negotiations between PMAC and KSC regarding responsibility for the Consent Order conditions. Based on the information available, the court finds that the February 28 report includes all the Consent Order environmental conditions for which PMAC claims B & W is liable.

The February 28 report appears to be extremely thorough, as it includes seventy-eight potentially problematic environmental conditions at the Koppel Plant, many of which EPA did not include in the Kearney Report.[49] PMAC identified all of the Consent Order conditions on the schedules to the PMAC–KSC agreement,[50] categorizing conditions as "Known Violations" and "Suspected Violations." Finally, during negotiations with KSC, PMAC made the following comment with respect to responsibility for the Consent Order cleanup:

> PMAC further acknowledges that all matters listed in the Consent Order with the exception of those related to releases of hazardous constituents generated by KSC after October 4, 1990, are Known or Suspected Violations under the terms of the [PMAC/KSC] Agreement, for which, as between PMAC and KSC, PMAC accepts full financial responsibility.[51]

PMAC appears to have identified for KSC all known and suspected violations from the February 28 report and then informed KSC that, with one exception, all the Consent Order items fell under those same known or suspected violations under the terms of their agreement. Given the thoroughness of the Burgess Report, PMAC's apparent concession that the February 28 report included all the environmental issues in the Consent Order, and PMAC's lack of an assertion to the contrary, the court finds that the February 28 report includes all the Consent Order environmental conditions for which PMAC claims B & W is liable. Therefore, B & W is not liable for any of the Consent Order cleanup costs and expenses under Section 6.08(b) because PMAC discovered all of the Consent Order items prior to closing when it received the all-inclusive February 28 report.

### C. Federal and Pennsylvania Statutory law and Common Law Tort

█ PMAC asserts that B & W is liable for the Consent Order cleanup costs based on five separate non-contractual grounds: *(1)* Sections 107 and 113 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA");[52] *(2)* Section 2201 of the Declaratory Judgment Act ("DJA");[53] *(3)* the Pennsylvania Hazardous Material Emergency Planning and Response Act ("paMEPRA");[54] *(4)* the Pennsylvania Storage Tank and Spill Prevention Act ("paSTSPA");[55] and *(5)* Pennsylvania common law. B & W argues that all of PMAC's non-contractual claims are barred because the PSA includes an "exclusivity of remedy" clause in Section 10.05 and allocates between the parties any and all environmental liabilities within the con-

---

**49.** P–7745 at ¶ 28.

**50.** An agreement which closed on the same day as the B & W–PMAC agreement.

**51.** P–7746, Ex. O.

**52.** 42 U.S.C. §§ 9607, 9613.

**53.** 28 U.S.C. § 2201.

**54.** 35 Pa. Stat. Ann. §§ 6022.101 *et seq.* (2003).

**55.** 35 Pa. Stat. Ann. §§ 6021.101 *et seq.* (2003).

tract terms. PMAC argues that each cause of action is a "CERCLA-type liability," all of which require explicit language of indemnification, which the PSA does not have. The court concludes that the exclusivity of remedy clause, when viewed in light of Sections 3.03(e) and 6.08, bars any non-contractual CERCLA and CERCLA-type liability claims because the PSA allocates all CERCLA and CERCLA-type liabilities within the terms of the contract. Therefore, B & W is not liable for the Consent Order cleanup costs under non-contractual claims.

■ Section 107(e)(1) of CERCLA provides:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

Six courts of appeals have been called upon to interpret this seemingly inconsistent text.[56] These courts have uniformly reconciled the first and second sentences by holding that responsible parties cannot contract away their cleanup liability under CERCLA, but that they may agree to allocate the ultimate financial burden of that cleanup among themselves.[57]

■ This statutory scheme does not implicitly require that a release specifically refer to CERCLA liability in order to be effective in releasing CERCLA liability for two reasons.[58] First, CERCLA authorizes private ordering of ultimate risk distribution.[59] Second, the requirement of a specific release of CERCLA liability would increase the potential for inadvertent failures to release CERCLA liability when such release is intended to be included in a general release of all liability.[60]

■ Although federal law governs issues relating to the validity of a release of a federal cause of action, courts apply state

---

**56.** *Hatco Corp. v. W.R. Grace & Co. Conn.,* 59 F.3d 400 (3d Cir.1995); *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10 (2d Cir. 1993); *John S. Boyd Co., Inc. v. Boston Gas Co.,* 992 F.2d 401 (1st Cir.1993); *United States v. Hardage,* 985 F.2d 1427 (10th Cir. 1993); *AM Int'l, Inc. v. International Forging Equipment Corp.,* 982 F.2d 989 (6th Cir.1993); *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454 (9th Cir.1986).

**57.** *Fisher Dev. Co. v. Boise Cascade Corp.,* 37 F.3d 104, 107 (3d Cir.1994)(citing *Beazer East Inc. v. The Mead Corporation,* 34 F.3d 206 (3d Cir.1994)); *Hatco Corp.,* 59 F.3d at 404 (although private agreements to indemnify or hold harmless cannot nullify a party's underlying CERCLA liability, they are effective to shift ultimate financial loss); *Olin Corp.,* 5 F.3d at 14 ("private parties may contract with respect to indemnification and contribution" but "all responsible parties remain fully liable to the government"); *John S. Boyd Co., Inc.,* 992 F.2d at 405 ("a party cannot escape lia-

bility by means of a contract with another party" but parties "can allocate responsibility among themselves by contract"); *Hardage,* 985 F.2d at 1433 (parties have "the right to obtain indemnification for [CERCLA] liability"); *AM Int'l, Inc.,* 982 F.2d at 993–95 (a release can effectively allocate among responsible parties the financial burden of CERCLA cleanup liability); *Mardan Corp.,* 804 F.2d 1454 (enforcing release of CERCLA liability).

**58.** *Fisher Dev. Co.,* 37 F.3d at 110.

**59.** *Id.*

**60.** *Id.* ("[i]n short, while there will be some instances in which CERCLA claims are inadvertently released if general releases are enforced as written, we think there would be far more instances, if [a specific release requirement] were adopted, in which parties inadvertently *fail to release* their CERCLA claims when they intend to do so.").

rules of release and contract law when giving content to federal law.[61] Thus, the allocation of CERCLA liability is governed by state contract law.[62] In this case, the parties agree that the PSA is governed and construed in accordance with Pennsylvania law.[63]

The parties do not clearly say whether the disputed provisions qualify as release or indemnity provisions. B & W fails to clearly distinguish between the two types of provisions. PMAC's initial filings did not distinguish between the two, but its recent filings argue that the provisions are indemnity provisions.[64] Regardless of whether the terms at issue are release or indemnity provisions, the outcome is the same: The terms of the PSA clearly and unambiguously allocate between the parties *all* environmental liabilities.

## 1. Release Provisions

The parties have not cited and the court cannot find any Pennsylvania case law that discusses the allocation of CERCLA liability through release provisions. Without Pennsylvania case law on point, the court will consider the reasoning of federal courts applying other states' laws.[65] A

number of federal courts have applied the law of states other than Pennsylvania and come to the conclusion that broad release provisions include CERCLA liability, even when CERCLA is not specifically mentioned.[66] The Court of Appeals for the Ninth Circuit, applying New York law, has held that a broad but unspecific release included CERCLA liabilities.[67] Similarly, the Court of Appeals for the First Circuit, applying Massachusetts law, has held that, "[t]o transfer CERCLA liability, the agreement must contain language broad enough to allow us to say that the parties intended to transfer either contingent environmental liability, or all liability." [68] Finally, the Court of Appeals for the Sixth Circuit, applying Ohio law, recognized that an assumption agreement "which contains broad language sufficient to indicate that the parties intended to include all liabilities, will include environmental liabilities as well without specific reference to an environmental statute such as CERCLA." [69]

## 2. Indemnification Provisions

There is limited Pennsylvania case law discussing the allocation of CERCLA liability through indemnification provisions.[70]

61. *Id.* at 108.

62. *M & M Realty, Co. v. Eberton Terminal Corp.*, 977 F.Supp. 683, 687 (M.D.Pa., 1997).

63. PSA, § 12.07("THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA....") (P–7745, Ex. A).

64. *Compare* Brief in Support of PMAC's Response to B & W's Motion for Partial Summary Judgment, (suggesting the language is an indemnity provision), *with* PMAC, Ltd.'s Submission in Support of Its Response to the Babcock and Wilcox Company's Objection to Claim No. 33 at p. 6 ("we are dealing with a remedy clause, not an indemnity clause").

65. *See M & M Realty, Co.*, 977 F.Supp. at 688 ("[i]n the absence of Pennsylvania law on the [allocation of CERCLA liability through indemnification provisions], we will follow the reasoning of the majority of federal courts to consider this question.").

66. *Fisher Dev. Co.*, 37 F.3d at 110 n. 1.

67. *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1462 (9th Cir.1986).

68. *John S. Boyd Co.*, 992 F.2d at 406–07.

69. *White Consol. Industries, Inc. v. Westinghouse Elec. Corp.*, 179 F.3d 403 (6th Cir.1999) (citing *Olin Corp.*, 146 F.3d at 407).

70. *Keystone Chemical Co. v. Mayer Pollock Steel Corp.*, 1997 WL 401587 (E.D.Pa.); *M &*

Although the court in *M & M Realty* relied on the reasoning of other federal courts to conclude that "there can be no allocation of CERCLA liability without explicit language of indemnification, clearly manifesting the parties' intent to transfer environmental liability,"[71] the Pennsylvania Superior Court has more recently affirmed a trial court's decision that an indemnity clause that did not mention CERCLA was sufficient to include CERCLA.[72] Additionally, in an Eastern District of Pennsylvania unreported opinion,[73] the U.S. District Court, applying Pennsylvania law, held that a court considering whether an indemnity provision is enforceable with respect to CERCLA liability must determine whether the party seeking indemnity has established, from the clear and express language of the indemnity clause itself, and from construction of the entire agreement, that the parties intended to include environmental hazard claims.[74] Based on this standard, the Court in *Keystone* determined that a broad indemnity provision would relieve a party from liability for contribution to CERCLA response costs.[75]

PSA Section 10.05, titled "Sole and Exclusive Liability," provides, "[t]he sole and exclusive liability of an Indemnifying Party and the sole and exclusive remedy of an Indemnified Party, whether based on contract, tort (including negligence), strict liability or otherwise, shall be as provided herein." The "as provided herein" includes, but is not limited to, Sections 3.03 and 6.08 and Paragraph 2(b) of the First Amendment. Each of those provisions outlines specific terms of B & W's and PMAC's environmental liability. In Section 3.03(e), PMAC assumed:

> All liabilities and obligations arising out of, resulting from, or relating to ... the discharge, emission or release of Pollutants and Contaminants from the business or the generation, treatment, storage, or disposal of any Wastes [by B & W] ... at or upon the real property included in the Acquired Assets ... prior to [closing] as provided in Section 6.08.

Section 6.08 allocates between the parties liability for all environmental problems discovered prior to and after closing. Finally, Paragraph 2(b) of the First Amendment comprehensively allocates between the parties any and all liability related to the RCRA Part B permit. When viewed as a whole, the PSA comprehensively and broadly outlines all environmental liability, which includes CERCLA and CERCLA-type liabilities.

Whether framed as indemnity or release provisions, it is clear that B & W and PMAC intended for Section 3.03(e), Section 6.08, and Paragraph 2(b) to allocate all environmental liability within the terms of the contract.[76] The court agrees with the reasoning of the Pennsylvania Superior Court in *County of Delaware* and concludes that although the terms of the PSA did not explicitly address CERCLA, they are broad enough to allocate all environmental liabilities, including CERCLA and CERCLA-type liabilities. Thus, the all-inclusive terms of the PSA, taken in light of the exclusivity of remedy clause, bar

---

*M Realty, Co.*, 977 F.Supp. at 683 (evaluating liability through an "as is" clause, but using an indemnification standard); *County of Delaware v. J.P. Mascaro & Sons*, 830 A.2d 587 (Pa.Super.2003).

**71.** *M & M Realty, Co.*, 977 F.Supp. at 688.

**72.** *County of Delaware*, 830 A.2d 587.

**73.** *Keystone Chemical Co.*, 1997 WL 401587.

**74.** *Id.* at *3.

**75.** *Id.* at *5.

**76.** Boyar Dep. at 168 (P–7746, Ex. G).

352

any non-contractual CERCLA and CERCLA-type liability claims. Therefore, B & W is not liable for the Consent Order cleanup costs and expenses under non-contractual claims.

## IV. *Conclusion*

For the reasons set forth in this memorandum opinion, the court finds that PMAC's claim is limited to $147,203.99, which represents the costs PMAC proved were necessary to clean up the forty-eight SWMUs and three AOCs identified in the Kearney Site Report.